**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, and The City of New York, Plaintiffs,**

v.

**LOCAL 638 ... LOCAL 28 OF the SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, et al., Defendants.**

**No. 71 Civ. 2877 (RLC).**

United States District Court, S.D. New York.

March 6, 1995.

Paul A. Crotty, Corp. Counsel of City of New York, New York City (Hilary B. Klein, Neil M. Corwin, Paul Kazanoff, John P. Stern, of counsel), for plaintiff City of New York.

G. Oliver Koppell, Atty. Gen. of State of New York, New York City (Sanford M. Cohen, of counsel), for plaintiff NY State Div. of Human Rights.

Edmund P. D'Elia, P.C., New York City (Edmund P. D'Elia, Gregory R. Begg, of counsel), for defendant Sheet Metal Workers Local Union 28.

Gold, Farrell & Marks, New York City (Martin Gold, of counsel), for defendants Sheet Metal and Air Conditioning Contractors Ass'n of New York City, Inc. and Sheet Metal and Air Conditioning Contractors Nat. Ass'n of Long Island, Inc.

*AMENDED AND CORRECTED*

***OPINION***

ROBERT L. CARTER, District Judge.

Plaintiffs City of New York and New York State Division of Human Rights ask the court to hold defendant Local 28 of the Sheet Metal Workers International Association ("Local 28") in contempt of court on the basis of numerous alleged violations of this court's Order and Judgment entered in 1975 ("O & J") and the Amended Affirmative Action Program and Order ("AAAPO") entered by this court in 1983. In the alternative, they seek modification of the AAAPO. Plaintiff Equal

Employment Opportunity Commission is not a party to this motion. The parties also ask the court to approve several stipulations into which they have entered.

■ This court has continuing jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the case was originally brought under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–6(a). It also has jurisdiction pursuant to the court's inherent powers to enforce its orders and to punish violators for contempt. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–765, 100 S.Ct. 2455, 2463–2464, 65 L.Ed.2d 488 (1980); 18 U.S.C.A. § 401 (1966).

*I. Background*

Local 28 is a union representing sheet metal workers who work for contractors in the New York metropolitan area. The Local 28 Joint Apprenticeship Committee ("JAC") is a management-labor committee which runs an apprenticeship program to teach sheet metal skills to entrants into the union. The Sheet Metal and Air Conditioning Contractors Association of New York City, Inc. and the Sheet Metal and Air Conditioning Contractors National Association of Long Island, Inc. ("Contractors' Associations") are trade associations of building contractors which employ sheet metal workers in New York City and Long Island. The Contractors' Associations were not named in the original complaint but have since been joined by the court for the purposes of obtaining complete relief.

The background of this case has been thoroughly documented in previous opinions of this court, the Second Circuit and the Supreme Court, *see Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172 (2d Cir. 1985), *aff'd*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 674 F.Supp. 91 (S.D.N.Y.1987) (Carter, J.), but for purposes of clarity this opinion will provide a summary of the case.

This case dates back to 1964 when the state of New York commenced proceedings in state court against Local 28 in response to the union's refusal to admit blacks as members and apprentices. In 1971, the United States charged Local 28, the JAC, and several other unions and contractors' associations with violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The Local 28 case was severed, the EEOC was soon substituted for the United States, and the New York City Commission on Human Rights ("City") and New York State Division on Human Rights ("State") intervened as plaintiffs. Judge Werker of this court held a trial and determined that Local 28 and the JAC had violated Title VII and New York law by denying nonwhites [1] access to employment opportunities in the sheet metal trades. *EEOC v. Local 638*, 401 F.Supp. 467 (S.D.N.Y.1975) (Werker, J.), *aff'd in part*, 532 F.2d 821 (2d Cir.1976). He then entered the O & J, which enjoined Local 28 and the JAC from discriminating against nonwhites and enjoined a number of specific practices which he found to be discriminatory. He also ordered the union to achieve 29% nonwhite membership by July 1, 1981, awarded back pay to nonwhites excluded from union membership, appointed an administrator ("Administrator"), and ordered the parties to design new recruitment and admission procedures to achieve the membership goal. The Administrator accordingly proposed an affirmative action program, which the court adopted.

The Second Circuit affirmed Judge Werker's finding of liability and most of the remedies that he had ordered, modifying only part of his remedy regarding the apprenticeship program. *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 532 F.2d 821 (2d Cir.1976). On remand, Judge Werker adopted a Revised Affirmative Action Plan and Order ("RAAPO") which, among other things, extended the 29% membership goal for one year, and the Second Circuit affirmed this plan. *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 565 F.2d 31 (2d Cir.1977).

In 1982, the City and State commenced a series of contempt proceedings strikingly similar to the current proceeding, alleging that Local 28 and the JAC had failed to meet the membership goal because they had violated a number different provisions of the O & J and RAAPO. Judge Werker issued a civil contempt order, finding that Local 28 and the JAC had "failed to comply with RAAPO ... almost from its date of entry," and imposed a fine of $150,000, which he ordered Local 28 and the JAC to deposit in a fund to be used to increase nonwhite membership in the union. *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers Int'l Ass'n*, No. 71 Civ. 2877, 1982 WL 445, *4 (S.D.N.Y. Aug. 16, 1982) (Werker, J.). In 1983 the City brought a second contempt proceeding on the basis of the failure of the union and the JAC to maintain and submit records in violation of the O & J, the RAAPO, and several administrative orders. The Administrator found contempt, and Judge Werker adopted his findings, ordering the union and the JAC to finance a computerized recordkeeping system. He also entered an Amended Affirmative Action Plan and Order ("AAAPO") which, among other measures, increased the nonwhite membership goal to 29.23% and extended the deadline for meeting the goal to August 31, 1987. In 1987 this deadline was again extended to August 31, 1992, pursuant to a stipulation between the parties.

The Second Circuit affirmed most of Judge Werker's contempt findings, upheld the contempt remedies he had ordered, and affirmed the AAAPO with modifications to the apprenticeship program, *Local 28*, 753 F.2d at 1172, and this opinion was upheld by the Supreme Court. *Local 28*, 478 U.S. at 482–83, 106 S.Ct. at 3053–54. When Judge Werker passed away, I inherited the case.

In the instant contempt motion, the plaintiffs allege that the union has violated the AAAPO and O & J by failing to achieve the membership goal, ensure equal work opportunities for its white and nonwhite members,

---

1. The term "nonwhites" has been used since the beginning of this case to define the plaintiff class of "black and Hispanic workers." *See, e.g., Local 28*, 674 F.Supp. 91, 93 (S.D.N.Y.1987) (Carter, J.).

and keep accurate and complete records. Specifically, the plaintiffs claim that the union has inflated its census reports to make it appear as if it were closer to achieving the membership goal than it actually is, has permitted and contributed to a disparity between the hours worked by white and nonwhite members, and has adopted a reinitiation policy having a disparate impact on minorities.

The plaintiffs seek a wide range of remedies for the alleged contempt. To remedy the hours disparity, they ask the court to order the union to operate a hiring hall which will refer its members to jobs and to implement a work sharing system in which journeypersons would return to the hiring hall after working for a given period of time. They also seek back pay for nonwhite journeypersons whose hours fall two or more standard deviations below the norm. To remedy the failure to meet the nonwhite membership goal, plaintiffs ask the court to calculate the membership goal separately for journeypersons, to set up interim goals, and to invalidate the reinitiation policy. To remedy the inaccurate and incomplete recordkeeping, the plaintiffs request the court to order the union to implement and pay for a new recordkeeping system. Finally, the plaintiffs seek attorneys' fees, court costs, and reimbursement of experts' fees.

In response to this contempt motion, the parties have entered into several stipulations which they request the court to approve. In the first stipulation, the union agrees to institute a hiring hall and work share program similar to that requested by the plaintiffs in their contempt motion, and the plaintiffs agree to withdraw that request if the stipulation is approved. *See* Appendix A, Proposed Stip. & Order Regarding Hiring Practices ("hiring hall stipulation"). In the second stipulation, the union agrees to modify its reinitiation policy, and the plaintiffs agree that as soon as the union has done so they will withdraw their request for invalidation of the current reinitiation policy. *See* Appendix B, Proposed Stip. & Order Regarding Reinitiation to the Union ("reinitiation policy stipulation"). In the third stipulation, the union agrees to institute and pay for a new compu-

terized recordkeeping system, and the plaintiffs agree to withdraw their request for a new recordkeeping system. I have signed the recordkeeping stipulation—the other two will be discussed in this opinion.

## II. Liability for Contempt

### A. Contempt Standards

■ In order for the court to find contempt on the part of the union for not complying with a court order, the order must be "clear and unambiguous, the proof of noncompliance [must be]. . . . 'clear and convincing,'" and the union must not have "been reasonably diligent and energetic in attempting to accomplish what was ordered." *Local 28,* 753 F.2d at 1178 (quoting *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981)). It is not necessary that the union willfully disobey the court's order for there to be contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499–500, 93 L.Ed. 599 (1949); *Local 28,* 753 F.2d at 1178.

■ Parties are bound by a court order until the court modifies the order or releases them from it, and defendants who act without first asking the court to clarify the order "act[ ] at their own peril." *McComb,* 336 U.S. at 192, 69 S.Ct. at 500; *see also Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). On several prior occasions this court has been forced to remind the union that it is not free to disregard court orders simply because it does not believe that it is bound by them. *See, e.g., EEOC v. Local 638* ... *Local 28 of Sheet Metal Workers' Int'l Ass'n,* No. 71 Civ. 2877, Mem.Decision by Special Master David Raff, at A–131—A–132 n. 5 (S.D.N.Y. May 18, 1983) (Werker, J.) ("Administrator's Decision"). The union continues to insist that it may decide when to violate the court's orders, evincing its blatant disrespect for the court and for the principles underlying those orders. *See infra* p. 653.

■ A contempt proceeding does not provide an opportunity for a party to relitigate the factual basis of a court order. *United States v. Rylander,* 460 U.S. 752, 756, 103

S.Ct. 1548, 1552, 75 L.Ed.2d 521, *reh'g denied*, 462 U.S. 1112, 103 S.Ct. 2466, 77 L.Ed.2d 1342 (1983). Consequently, the court will not consider claims that its orders were unreasonable when they were issued, but the union may defend against the contempt citation by showing that circumstances have arisen that make compliance with the court's order *presently* impossible and that were unforeseen when the order was issued. *Id.* at 757, 103 S.Ct. at 1552–53; *see also Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Chase Manhattan Bank, N.A.*, 590 F.Supp. 1160 (S.D.N.Y.1984) (Goettel, J.) (refusing to permit impossibility defense where none of the facts had changed). Defendants have the burden of production in such cases, and this burden may be difficult to meet, especially "where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley*, 800 F.2d at 36; *see also EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*, 669 F.Supp. 606, 611 (S.D.N.Y.1987) (Carter, J.), *aff'd*, 925 F.2d 588 (2d Cir.1991). The burden is "certainly not less where the obligations in question were accepted in a decree entered on consent." *Aspira of N.Y., Inc. v. Board of Educ. of N.Y.*, 423 F.Supp. 647, 654 (S.D.N.Y.1976) (Frankel, J.). An impossibility defense will not lie where the defendant cannot demonstrate that he has made diligent efforts to comply with the order.

"A person charged with civil contempt is entitled to notice of the allegations, the right to counsel, and a hearing at which the plaintiff bears the burden of proof and the defendant has an opportunity to present a defense." *United States v. Yonkers*, 856 F.2d 444, 452 (2d Cir.1988). Under Local Civil Rule 43(b), a district court need not take oral evidence if the alleged contemnor does not demand a hearing. In this case, the union has not requested a hearing, and in light of the great volume of evidence submit-

ted by the parties and the substantial amount of uncontested evidence, the court does not find it necessary to hold a hearing and will decide this motion on the parties' submissions.[2]

## B. Methodology

Both plaintiffs and the union use statistical experts to present their evidence regarding the contempt motion, and each expert attacks the credibility and methodology of the other. The statistical evidence forms the basis of the plaintiffs' case, so the court finds it necessary to assess the validity of the statistical studies. For over a decade, in his role as an expert for Local 28, Dr. Richard Buchanan has used statistics in a misleading manner. At one point he used methods that were "so clearly misdirected as to lead to the conclusion that they were used in a conscious effort to result in depressed findings." *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, No. 71 Civ. 2877, Memorandum and Order, slip op. at 4 (S.D.N.Y. Aug. 31, 1983) (Werker, J.). At another, he "lost his credibility when he attempted to use statistics to explain away every compliance problem that defendants had," *EEOC v. Local 638 ... Local 10*, No. 71 Civ. 2877, Report and Recommendation of Special Master David Raff at 46 (S.D.N.Y. Jan. 19, 1993) (Carter, J.), and gave opinions that "defie[d] common sense," *id.* at 49–50.

In the report submitted by the union in response to the plaintiffs' contempt motion, Dr. Buchanan continues his practice of attempting to mislead the court. In his haste to criticize the plaintiffs' expert, Dr. Bernard Siskin, Dr. Buchanan often fails to familiarize himself with the data and to understand Dr. Siskin's methods. For example, Dr. Buchanan claims that Dr. Siskin did not take into account the fact that the northern counties of New Jersey demerged from Local 28 in June 1991, and that as a consequence Dr. Siskin's data for that year is tainted by the inclusion of people who were no longer Local 28 mem-

---

2. The contractors argue that they are entitled to discovery or a hearing if the court orders implementation of the hiring hall and work share plan. The relief in this case is ordered against the union, not against the Contractors' Associations. The contractors have been brought in as defen-

dants to ensure that the relief ordered against the union is as complete as possible and to allow the contractors to play a role in shaping the relief to the extent that it affects them. Consequently, the contractors are not entitled to discovery or a hearing.

bers. Dr. Buchanan ignores the fact that all of Dr. Siskin's data ended in March 1991 precisely in order to avoid the difficulties posed by the demerger. Similarly, Dr. Buchanan notes that Dr. Siskin examined the numbers of hours that journeypersons worked in roofing and ventilation shops to determine whether they had special skills. Dr. Buchanan asserts that this analysis is invalid because these shops are typical, not special, disregarding Dr. Siskin's explanation that he uses roof and ventilation work as a proxy for *lack* of special skills. Finally, Dr. Buchanan claims that in conducting regression analyses regarding the effect of various factors on the hours worked by journeypersons Dr. Siskin combined data from several different years and that the data should not have been combined because economic conditions during those years varied widely. Had Dr. Buchanan paid attention to Dr. Siskin's results, he would have seen that Dr. Siskin did not run his regression analyses for the entire period but rather ran them for each year and then calculated the average disparity for the entire period, which he expressed both as a number and in units of standard deviation.

When Dr. Buchanan cannot find the source of Dr. Siskin's data he simply asserts, with no basis, that Dr. Siskin must have fabricated the data. For example, Dr. Siskin used a computer file that the union compiled which listed the hours worked by each member to assess the disparity between hours worked by white and nonwhite workers. Dr. Buchanan claims that there is no race data included in this file, but he seems to have looked at the wrong file. He also complains that in reconstructing the union's census reports Dr. Siskin *might* have used data from the "APTFIL" hours file for periods of time for which the union failed to compile the data, ignoring the fact that Dr. Siskin states in his report that he used only the membership files to reconstruct the census and did not use data from the hours files.

Other of Dr. Buchanan's criticisms of Dr. Siskin stem from flaws in the data that the union provided to the plaintiffs. The plaintiffs seem to have satisfactorily compensated for this faulty data, and it does not seem to have undermined the integrity of their analyses. For example, Dr. Buchanan claims that Dr. Siskin was unaware of the fact that the union's membership files contain data for people who entered the union as production and asbestos workers, who are not covered by the AAAPO, and who later switched to sheet metal work. Dr. Buchanan fails, however, to estimate how much error this oversight could have inserted into the plaintiffs' statistics. In fact, Dr. Siskin requested the union to provide information regarding how many of these workers were included in the files. The union was unable to provide an exact figure, but it did estimate that throughout the period 1984–1991 there were no more than twenty-five such members and that the number had dwindled to one member by 1993. Thus, there were too few workers involved to skew the plaintiffs' statistics.[3]

In addition to their statistical evidence, the plaintiffs also submit affidavits of nonwhite union members dated from December 1992 through June 1993 in support of their contempt motion, so that one can truly understand the impact that the contempt had on the lives of the individual journeypersons. These stories of unrealized dreams and personal pain are summarized in Appendix C in order to give the statistics more meaning and context.[4] In their affidavits the journeypersons allege that white mechanics were given

3. The union relies on *EEOC v. IBM Corp.*, 583 F.Supp. 875, 906 (D.C.Md.1984), to argue that the inclusion of production and asbestos workers in Dr. Siskin's data render his entire regression analysis invalid. In that case, however, the court concluded that the "plaintiff's statistical case ... fail[ed] to establish even an inference of disparate treatment by IBM" in its Title VII employment discrimination case. Unlike the present case, "[t]he infirmities in [the] analysis [were] many," including "[i]gnoring key variables" which may have been "significant determinants"

in the analysis. *Id.* It was this level of carelessness and error that led the court to conclude that the analysis was "flawed from its inception and [could] not be considered competent for consideration." *Id.*

4. The court includes these affidavits with the caveat that some of the allegations may be contested. However, the statistics make it clear that while specific details may be controvertible, the spirit of the affidavits is accurate.

overtime opportunities, were allowed to work at positions which enabled them to learn skills, and were employed on a long-term basis while the minority journeypersons were denied all of these benefits.

Jamie K. Nicastri, an associate in the firm of Edmund P. D'Elia, attorney for Local 28, seeks to discredit the "anecdotal" testimony of the minority journeypersons. (Nicastri Aff. in Opp. to Plaintiff's Mot. for Contempt ¶ 4.) Nicastri discounts their stories of employment discrimination and of lack of access to opportunities for more skilled and economically rewarding employment. Nicastri claims that the affiants have not shown that whites were given preferences over minorities, that the contractors engaged in discriminatory treatment and that the minority affiants had satisfactory attendance records.

These arguments are unconvincing. The record shows that most of the poor attendance records occurred during an individual's apprenticeship and that minority journeypersons were not denied work because they were unskilled. Furthermore, the union's obligation under the consent decree requires that Local 28 investigate discrimination claims, especially in the face of the undisputed evidence that white journeypersons junior in work experience to some of the senior minority journeypersons are working steadily as mechanics while minority persons once they finish the apprentice program are not. The responses to the claims of the minority journeypersons are evidence that the union is not in compliance with the AAAPO.

## C. Violations

### 1. Recordkeeping Violations

Pursuant to the O & J and AAAPO, the union is required to provide and maintain certain records in order to ensure its compliance with court orders. See O & J at ¶ 21(e); AAAPO at ¶¶ 4, 50–60. This court has concluded that "accurate reporting of membership is an essential part of the [Amended Affirmative Action] Program" and is necessary to ensure compliance with its mandates. EEOC v. Local 638, 421 F.Supp. 603, 606, 620 (S.D.N.Y.1975) (Werker, J.), modified, 532 F.2d 821 (2d Cir.1976); see also Local 28, 478

U.S. at 444 n. 23, 106 S.Ct. at 3033 n. 23 ("the detailed recordkeeping requirements ... w[ere] clearly designed to foster petitioners' compliance"); Local 28, 1982 WL 445, at *3 (recordkeeping and reporting were "absolutely vital to the effective monitoring and implementation" of the affirmative action plan).

However, Local 28 has a tradition of failing to provide and maintain accurate records as required by the O & J and the AAAPO, resulting in prior contempt findings by this court. See Local 28, 753 F.2d at 1182 (upholding 1982 and 1983 contempt findings on the basis of "union's ... egregious noncompliance"); Administrator's Decision at A–131, A–133 ("Local 28's failure to provide complete, accurate and timely data" resulted in contempt finding). This court has noted that "[t]he record in both state and federal court against these defendants is replete with instances of their bad faith attempts to prevent or delay affirmative action." Local 28, 478 U.S. at 476–77, 106 S.Ct. at 3050 (quoting Local 28, 401 F.Supp. at 488). Once again, Local 28 has been accused of failing to provide the requisite documentation, in contempt of the court's orders.

■ Neither this court nor either of the parties asserts that the O & J or the AAAPO is unclear as to their recordkeeping provisions. Pursuant to paragraph 58 of the AAAPO, "[d]efendants shall maintain all records and/or lists in the computer base which are necessary to produce all the reports required pursuant to the O & J and this Amended Program." In addition,

[a]ll records and lists required to be compiled by the O & J and this Amended Program shall be maintained until such time as the Court terminates this Amended Program and shall be made available for inspection and copying by plaintiffs and the Administrator.... Plaintiffs and the Administrator shall be permitted access to all computer tapes containing records or reports required by the O & J or this Amended Program.

AAAPO at ¶ 60. Despite the plan's unequivocal mandate that the union compile and keep the requisite information, at least since

1984 Local 28's maintenance of its records has been irresponsible and sloppy at best, and purposefully deceptive at worst. Census reports have neither been saved on computer nor retained on hard copy, and records of hours worked have not been maintained as required by paragraph 52 of the AAAPO. For example, the union has continually updated its computer database without saving any copies of the biennial census reports, and it could not provide hard copies of the census reports for March 1989 and March 1990. In addition, the union did not provide hours files from October 1988 through December 1988, as required by paragraph 52 of the AAAPO. Local 28 does not deny that it failed to keep these required records. Rather than explain why it has failed to supply the court with the requisite records, the union gives a laundry list of documents that it did manage to submit. This is no defense. The union does not have the discretion to pick and choose which information it will surrender to the court and which it will withhold. The O & J and the AAAPO require that Local 28 submit all of the enumerated documents; anything less is noncompliance.

In prior contempt findings against Local 28, this court has concluded that where recordkeeping falls short of what its orders demand there is contempt. For example, the court has concluded that

> [c]ompliance with the quarterly reporting requirements is not satisfied by anything less than four complete reports each year. The defendants' contention that two reports in 1979, two reports in 1980 and no reports in 1981 is sufficient does nothing more than evince their blatant disregard for their obligation to provide the appropriate parties to this suit with information pertinent to the enforcement of the O & J and RAAPO.

*Local 28*, 1982 WL 445, at *4. The court has also found contempt where "names and racial or ethnic identities of [new union members] were not provided to the ... Administrator." Administrator's Decision at A–130, A–131.

The relevant sections of the court's orders do not require Local 28 to produce information that is not in its possession or under its control, rendering compliance with the court order factually impossible. *See* discussion *supra* pp. 649–650. The union does not claim that it is presently incapable of producing the documents in question, and furthermore, it is the union's obligation to inform the court if it is unable to furnish the requisite records—it may not make an independent determination not to submit certain information. *See* Administrator's Decision at A–137, A–140 ("a unilateral decision that various provisions cannot or will not be met will continue to lead to findings of violation").

Not only has the union failed to maintain the records required of it, but the records that it has submitted to the court have been inaccurate. Pursuant to paragraph 51 of the AAAPO, twice a year

> Local 28 shall submit to the plaintiffs and the Administrator both a geographical census, by former local, and a master census of its membership which shall include ... a) the total number of journeymen; b) the total number of apprentices; c) the percentage of non-whites and d) the name, address, race/national origin, social security number and number of hours worked in the prior six (6) months by each Local 28 journeyman and apprentice.

Paragraph 4 of the AAAPO states clearly that

> [f]or the purpose of measurement, total membership shall include: (a) all journeymen members; (b) all pensioners, reduced or limited members who, while receiving any retirement benefit ... have been employed as sheet metal workers by a Local 28 contractor within three (3) years prior to the date of the most recent membership census; (c) all members or participants in the Apprentice Program; and (d) all individuals who (i) have been offered admission to and membership in Local 28 but have ... deferr[ed]

for no more than two years. The "defendants must insure, to the greatest degree possible, that the data submitted to the parties are true and correct." Administrator's Decision at A–132.

Despite the plan's plain language, the union's compilation of census report data has been haphazard and full of errors. First, the

reports included union members who had been terminated for non-payment of dues and were no longer considered members under Local 28's own Constitution. Members who are suspended and then terminated for non-payment of dues "forfeit all rights, privileges, and benefits of membership." Constitution and Ritual of the Sheet Metal Workers International Association, Art. 16, § 10. For example, Travers Everson, an African–American former member, was included in the March 1993 census report, despite the fact that his membership was terminated in 1990 for failure to pay dues as a result of unemployment. This inclusion of suspended and terminated members inflates the union's nonwhite membership because nonwhites are suspended at a higher rate than their white counterparts. *See* discussion *infra* pp. 665–666. For example, the March 1991 hard copy list of membership submitted by the union as required by paragraph 51 of the AAAPO included 162 individuals whose membership had been terminated by March 1991, 38.9% of whom were nonwhite. Excluding these terminated individuals would bring the percentage of nonwhite journeypersons from 16.44% to 15.52%, and the percentage of nonwhite membership in general from 21.40% to 20.76% for March 1991.

Second, the census reports excluded a group of disproportionately white union members who were listed as active members in the union's membership files. For example, the March 1991 hard copy list of membership submitted by the union excluded 497 individuals who were still considered active members and who had not retired within the past three years. Over 92% of the excluded individuals were white, and including these active members would reduce the percentage of nonwhite membership from 21.40% to 20.02% for March 1991.

Third, the census reports contained members who either were not listed in the union's membership files or were considered inactive. For example, the March 1991 census hard copy list included nine individuals who did not appear in the union's membership files, 77.8% of whom were nonwhite. Furthermore, the March 1991 hard copy list included thirty-eight journeypersons whom the union's membership files indicate were inactive, 15.8% of whom were nonwhite, although nonwhites comprised only 14% of all journeypersons during that month. Both of these inaccuracies serve to inflate the nonwhite membership rate.

Finally, the census reports counted some white members as nonwhite. For example, the March 1991 census hard copy list identified seventeen journeypersons as nonwhite, although the membership files identified them as white. This court has concluded that misreporting the race of union members constitutes grounds for contempt. *Local 28,* 753 F.2d at 1182 (finding contempt in part because of "misdesignation of … race"); *see also* Administrator's Decision at A–137 ("Local 28's submission of … [a white union member] as a nonwhite was either the result of gross negligence or wanton disregard of this court's orders," warranting a finding of contempt).

In sum, the union's misreporting of census data, in violation of the AAAPO, has resulted in the inflation of its nonwhite union membership for each year from 1984–1991, and in the obfuscation of its abysmal lack of progress toward meeting the AAAPO's 29.23% nonwhite membership goal. The defendant's own expert, Dr. Buchanan, has confirmed that the union exaggerated its nonwhite membership for the years 1985, 1988 and 1989, and found that none of the union's membership percentages from 1984 to 1991 submitted to the court was correct.

The inaccuracies are not limited to the census reports but rather extend to other data submitted by the union to the plaintiffs. First, the racial identification of union members has been inconsistent among and within data sources. For example, journeypersons were assigned different race-identifying codes in different files and were assigned different race-identifying codes in different weeks within a given file. Second, individuals who were identified in the hours files as employed were identified in the membership files as deceased, retired or suspended. Finally, some census lists could not be reconciled with membership lists covering the same period. For example, a computer file in December 1992, which was purported to

be a comprehensive census list of members dating back to 1984, did not include members who appeared on previous membership lists. The union acknowledged the error and had to supply updated membership lists in May 1993. Discrepancies in March 1991 alone included individuals who were included in the census but listed as terminated in the membership files; active journeypersons included in the membership files but not in the census; and journeypersons included in the census but listed as inactive in the membership files.

While the existence of a small number of errors would be understandable, the Second Circuit has concluded that numerous record-keeping mistakes constitute more than a *de minimus* violation of the affirmative action plan. *Local 28*, 753 F.2d at 1182. In the past, the sheer volume of mishaps and gross incompetence has led the court to be "convinced that ... [the union's] violation ... reflect[ed] defendants' unwillingness to comply with ... [the affirmative action plan]." *Id.* This court is of a similar mind in the present case. Given the sum total of Local 28's recordkeeping blunders, the union's noncompliance is clear and convincing.

The union has not been reasonably diligent and energetic in trying to meet its record-keeping responsibilities as defined by the O & J and the AAAPO. The union claims that white members were "inadvertently" omitted from membership lists and that others were deleted as a result of computer programming glitches. (Hilary B. Klein Decl. Concerning Union Record Keeping, Exh. C.) This type of excuse has been made unsuccessfully in the past. *See* Administrator's Decision at A–133 (the Administrator "reject[s] any argument that the ... [record keeping] problems were simply the result of human error"); *see also Local 28*, No. 71 Civ. 2877, slip op. (S.D.N.Y. Aug. 31, 1983) (Werker, J.) (affirming Administrator's recommendations and May 18, 1983 conclusion that "[i]t is inconceivable that the officers of Local 28 did not understand the importance of accurate record keeping and that all submissions to the parties, the Administrator, and the court had to be as correct as possible"). The court does not take such "accidents" lightly and

will not allow the union to keep using "oops" as a defense for noncompliance.

The union argues that "[g]iven the great number of [data] entries, clerical errors are not unusual." (Wilton Aff. ¶ 10.) Certainly, a reasonable and random number of such mistakes is expected. However, where there is a pattern of undercounting whites and overcounting nonwhites every single year this argument becomes highly suspect.

Furthermore, the union is responsible for creating and maintaining a system of checks and balances to ensure that its data is correct. Where the union has not set up a "formal system to verify the racial and ethnic composition of Local 28's membership ... [and s]uch verification that was done, was done on a totally haphazard basis," this court has found contempt. Administrator's Decision at A–133. Once again, "[t]he lack of any proper verification controls confirms ... that Local 28 has not acted in the affirmative manner contemplated by the court." *Id.*

Local 28's defense that it has been responsive to inquiries by the plaintiffs and the Administrator about its records is equally unimpressive. If it were not for the union's mismanagement of information to begin with, opposing counsel would not have had to constantly ask for clarification; Local 28 was simply fixing its own self-generated problems. The O & J and AAAPO do not permit the union to display a cooperative facade while simultaneously undermining the affirmative action program by providing inaccurate, shoddy, incomplete information to the court. The AAAPO specifically requires that the union take a proactive stand against discriminatory employment practices rather than adopt a passive, "band-aid," reactive posture.

The fact that the Administrator has not used the full force of his court-invested powers against the union does not warrant the union's self-congratulation or its assumption that the Administrator approved of the union's actions or lack thereof. The Administrator has indicated to the union on previous occasions that its recordkeeping was problematic, thus putting Local 28 on notice that it was in violation of the court's orders. *See* Administrator's Decision at A–130 (holding

Local 28 in contempt where Administrator gave clear prior notice that names and racial data had to be submitted because of a merger, yet union failed to provide this information). For example, upon discovery of a misdesignation of race error in 1990 the Administrator informed the union, "As you are aware, correct racial/ethnic identification of apprentices and members is critical to the validity of the record keeping system.... [Because this racial mis]identification has raised some question about the accuracy of the records, I am requesting that the ... union promptly review its records to determine their accuracy." (Letter from Raff to D'Elia of 1/16/90, at 1.) [5] The union acknowledged the problem, not surprisingly identifying it as a "computer clerical inadvertence," (Letter from D'Elia to Raff of 1/26/90, at 1,) as well as other errors. (Letter from D'Elia to Raff of 2/2/90, at 3 admitting that "[b]y reason of [a computer conversion] oversight, the March 1989 census report was produced with inaccuracies" and conceding that it was "alerted to certain [other] factual inaccuracies" prior to the census report).

Furthermore, the Administrator cannot independently verify certain data furnished to him; he can only recognize inconsistencies and discrepancies within the data. For example, the Administrator has no way of knowing by looking at the records whether a union member is white or nonwhite, is an apprentice or journeyperson, or is dead or alive. The fact that the Administrator did not take greater action against Local 28 may be attributable to his inherent inability to fully grasp the extent of Local 28's violation, not to the union's upstanding behavior. Moreover, "[i]t cannot be stated too strongly that the burden is not upon plaintiffs or the Administrator, but is upon defendants to act in a forthright and affirmative manner to comply with the letter and spirit of the court orders." Administrator's Decision at A–139.

### 2. Failure to Reach the Membership Goal

#### a. The Census Figures

In 1975, the court ordered the union to achieve 29% nonwhite membership by July 1, 1981. In 1976, in the RAAPO, the deadline was extended for one year. In 1983, in the AAAPO, the court adjusted the goal to 29.23% to take into account the fact that two unions had merged and as a result union members came from areas outside of New York City, and it extended the deadline to August 31, 1987. AAAPO ¶ 5. In 1987, pursuant to a stipulation between the parties, the court extended the deadline to August 31, 1992. The union's own census figures show that it has once again fallen far short of the nonwhite membership goal. As of March 1992, the last census prior to the August deadline, the union reported that nonwhites constituted only 23.61% of its membership. One month after the deadline expired, nonwhite membership had reportedly decreased to 22.89%. The most recent data supplied to the court indicates that as of March 1993, nonwhite membership was 24.13%.

In order to test the accuracy of the censuses that the union has submitted, both Dr. Siskin and Dr. Buchanan used the union's membership files to create their own censuses. Dr. Siskin's census covers every six-month period from September 1984 through March 1991, following the parameters set by the AAAPO, and for every period he studied Dr. Siskin found that the union's census figures inflated the percentage of nonwhite members. *See supra* pp. 653–654.

As already discussed, Dr. Buchanan attempts to destroy the credibility of Dr. Siskin's data in several different ways that the court does not find convincing. *See supra* pp. 650–651. Additionally, Dr. Buchanan notes that pursuant to the AAAPO pensioners who have not worked during the three years prior to a census should be excluded, and he argues that Dr. Siskin could not have determined from the membership files who had worked during the three years prior to 1984, 1985 or 1986 because the files do not provide information for time periods prior to 1984. Dr. Siskin worked around this flaw in the data by assuming that people worked until they started receiving pensions and then excluding those pensioners who had

---

5. As per the court's November 30, 1994 request, the Administrator provided prior correspondence between himself and the parties regarding recordkeeping and the hours disparity.

been pensioned for three years or more. Dr. Buchanan also claims that people who had been suspended for over two months on the date of a census should not have been excluded because some of them might have been members during part of the six-month period prior to the census. A census is a snapshot of the people in the union on the date of the census, not a cumulative measure of everyone who was a member at any time during the six-month period prior to the census date, so it does not matter who was a member prior to the date of the census. In fact, Dr. Buchanan complied with the "snapshot" definition of a census when he performed his own census and excluded from it people who were suspended and not readmitted or who transferred out, withdrew or died before the census date, revealing that his criticism of Dr. Siskin for following the same practice is specious.

Dr. Buchanan insists that the census he created shows that the union is even closer to reaching the membership goal than its own figures indicate, but his census contains a serious methodological error. Dr. Buchanan did not count anyone for whom the union did not assign an initiation date in its computer file of union members, resulting in the omission of an unacceptable proportion of union members. For example, he excluded 3,353 people from his June 1984 census, although the union only reported a total membership of 3,879 in September of that year. Dr. Buchanan's explanation for excluding these individuals is that he was trying to exclude all members who were production and asbestos workers and thus were not covered by the AAAPO. Since there were no more than twenty-five such employees during the relevant period, *see* discussion *supra* p. 651, Dr. Buchanan unnecessarily excluded approximately 3,328 employees in June 1984. The people for whom initiation codes are not listed are long-term members who are disproportionately white, so the result is that Dr. Buchanan has managed to exclude a large portion of the union's white employees, thus making the union's percentage of nonwhite employees appear greater than it actually is.

The plaintiffs have provided clear and convincing evidence that the union has failed to achieve the 29.23% membership goal, and although the union attacks the plaintiffs' methodology, it does not dispute this conclusion. As of March 1991, the last census prior to the demerger, Dr. Siskin's calculations show that the union's nonwhite membership was only 18.89%, which was 10.34 percentage points below the membership goal. It is evident that as of that date the union had not made diligent efforts to comply with the court's order, and the union has presented no evidence to show that it has taken steps since that time to speed the entry of nonwhites into the union.

### b. The Constitutional Argument

■■■ The union revives its old argument that the membership goal violates Title VII and the Equal Protection Clause despite the fact that the goal has been upheld twice by the Second Circuit and once by a plurality of the Supreme Court. Specifically, the Second Circuit has found that the membership goal satisfies a two-prong test for the validity of a temporary, race-conscious affirmative action remedy. *Local 28,* 753 F.2d 1172. The first prong, which requires a "clear cut pattern of long-continued and egregious racial discrimination," is satisfied because of the union's "long continued and egregious racial discrimination" and because the union's failure to meet the membership goal shows that the effects of the discrimination had not been eliminated. *Id.* at 1186 (cites omitted). The second prong, under which "the effect of reverse discrimination must not be 'identifiable', that is to say, concentrated upon a relatively small, ascertainable group of nonminority persons," is satisfied because "the effects of the affirmative action remedies incorporated in the AAAPO will not unnecessarily trammel the rights of any readily ascertainable group of nonminority individuals." *Id.* at 1187.

The union's persistent insistence on the unconstitutionality of the membership goal in spite of repeated rulings affirming the goal reveals the union's disrespect for the court and its orders. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers,* No. 71 Civ. 2877, 1988 WL 131293, at *4 (S.D.N.Y. Dec. 16, 1988) (Car-

ter, J.) (warning that "[c]ounsel is put on notice that it will be dealt with sternly, even to the point of sanctions, for making arguments that have already been disposed of"). The union's claim that the membership goal is unconstitutional and unenforceable is also surprising in light of the fact that the union stipulated to achieve the goal, leading the court to question whether the union signed the stipulation in good faith. The union does not assert that any of the factors underlying the Second Circuit and Supreme Court decisions upholding the membership goal have changed in a way that would require the court to revisit the issue of the constitutionality of the goal. On the contrary, almost twenty years after Judge Werker's original decree in this case the union's history of discrimination grows ever longer and more egregious and its continuing failure to meet the membership goal grows more distressing. The membership goal remains a necessary and permissible way to monitor the union's progress in ending its discriminatory practices.

### c. Impossibility Defense

■ The union asserts that it was not possible for it to achieve the membership goal by 1992, but it does not contend that circumstances have arisen that were unforeseen when the membership goal was set in the O & J in 1975, or when it was modified in 1976, 1983, and 1987 which now make compliance with the order impossible. See discussion supra pp. 649–650. The court notes that the union consented to the 1987 modification, which extended the deadline to August 31, 1992, and thus agreed that it would be able to meet the goal by that time. Nor has the union presented evidence that it has made diligent efforts to reach the membership goal. The union has not even moved the court to modify the goal based on the difficulty that it alleges that it has faced in meeting the goal. S.E.C. v. Musella, 818 F.Supp. 600, 602 (S.D.N.Y.1993) (Wood, J.) (finding lack of diligence in meeting duties under decree where defendant never requested modification or clarification). Consequently, it has no basis for raising an impossibility defense.

■ Even if the union did have the right to raise an impossibility defense, however, its defense would fail. The union claims that the impossibility of the union's meeting the membership goal is demonstrated by a study in which Dr. Buchanan calculated the rate at which the union could be expected to achieve the nonwhite membership goal given the 1984 levels of white and nonwhite journeypersons and apprentices, a yearly class of 100 apprentices entering the union, and 100 members leaving the union each year. Dr. Buchanan ran his analysis once using an average apprentice ratio of one nonwhite for every white and again using a ratio of three nonwhites for every white. He purports to show that based on the 3:1 ratio the union could achieve a nonwhite membership of only slightly over 22% by the end of 1991 and that based on a 1:1 ratio it could achieve just under a 21% ratio by that time.

Although the union asserts that it would have been impossible for it to have achieved a higher nonwhite membership by 1991 than predicted by Dr. Buchanan's models, the union in fact did achieve a higher nonwhite membership by that date, making it evident that the models are wildly inaccurate. As Dr. Buchanan notes, for every year from 1985 through 1990 the nonwhite membership of the union (as reported by the union) exceeded the maximum that Dr. Buchanan predicted that the union could achieve given a 3:1 nonwhite-to-white apprentice ratio. This result is particularly striking in light of the fact that the nonwhite to white apprentice ratio has never been as high as 3:1 and thus there have been fewer nonwhites entering the union than Dr. Buchanan assumed. Given that the model predicts that the result that actually occurred is impossible, the court finds that the union has not met its burden of production on this issue.

### d. Failure to Meet the Goal as Basis for a Finding of Contempt

■ The union contends that the court may not base its contempt finding solely upon the union's failure to reach the membership goal. The court need not reach this question, because there are numerous bases for the contempt finding, as the rest of the

opinion makes abundantly clear. Furthermore, in interpreting the AAAPO courts have always used the membership goal as a "benchmark" to measure whether defendants are complying with the court's orders. *See Local 28,* 478 U.S. at 478, 106 S.Ct. at 3051 (plurality op.). The court assumes that if the union and the JAC had not discriminated against nonwhites, the union would contain the same percentage of nonwhites as exists in the relevant labor force. The court views the union's failure to meet the goal as a symptom of its refusal to stop discriminating against nonwhites in admission to the union and in the provision of equal job opportunities to journeypersons, and it is on this discrimination, not on the failure to meet the membership goal, that the contempt finding is based.

It is important to recognize that the union's failure to meet the membership goal does not reveal the extent of the union's failure to erase the effects of its past and ongoing discrimination because the census includes apprentices as well as journeypersons. Apprentices are predominantly nonwhite, so even if union membership as a whole were equal to the percentage of nonwhites in the relevant work force, journeypersons could still be disproportionately white. For example, even the union's inflated figures show that in March 1991 the apprentices were 66.30% nonwhite, while journeypersons were only 16.44% nonwhite. The low proportion of nonwhite journeypersons is troubling because only journeypersons can take advantage of the employment opportunities which the AAAPO intended to guarantee. The apprenticeship program exists solely to create journeypersons, and people can be apprentices for only four years, during which time they earn between 30% and 70% of journeyperson wages. Consequently, the nonwhite membership percentage largely reflects the increasing number of nonwhites who spend four years in the apprenticeship program at a reduced wage, and it does not indicate that nonwhites are provided with the opportunity to have careers as sheet metal workers.

The court notes that the membership goal is twenty years old and may no longer reflect the composition of the relevant labor pool. In June 1991 the northern counties of New Jersey were demerged from Local 28 and formed a separate local. The parties have not submitted information to the court regarding the number of union members affected and how this move will alter the racial composition of Local 28, but they agree that the membership goal must be recalculated. The 29.23% goal is based on the 1970 census, and the 1990 census indicates that the percentage of whites in the New York metropolitan area has decreased over the past decade.

The union attempts to deflect attention from the fact that it has not attained the court-ordered membership goal by arguing that it cannot be held in contempt for failing to meet a membership goal that *may* no longer reflect the relevant labor pool. The union is indulging in mere speculation here, and its argument flies in the face of the rule that parties are bound by court orders until the court modifies the order or releases them from it.

The union does not argue that the order to achieve 29.23% nonwhite membership is somehow vague or unclear. Nor does the union contend that the changes in the larger population mean that the union's nonwhite membership suddenly reflects that of the nonwhite population in the relevant labor pool and thus all vestiges of discrimination have been erased. On the contrary, it seems probable that the departure of largely white counties in New Jersey from the union and the increase in the minority population of New York City will mean that there is a greater disparity between the nonwhite membership of the union and that of the larger population than currently appears.

The cases cited by the union in support of its contention that it cannot be held in contempt for failing to meet a membership goal that does not exactly reflect the relevant population are inapposite. This case concerns a contempt motion, in which the court focuses on whether the defendant has made a diligent effort to comply with the decree. It is the defendant's compliance with the decree, not the appropriateness of the decree, that is at issue here. In contrast, *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 97

S.Ct. 2736, 53 L.Ed.2d 768 (1977), and *EEOC v. Local 14, Int'l Union of Operating Eng'rs,* 553 F.2d 251 (2d Cir.1977), are Title VII cases in which precise measurement of the relevant population was necessary in order to determine whether the plaintiff had made out a prima facie case of discrimination. Acknowledging the difference between contempt and Title VII cases, the Second Circuit has ruled that the membership goal in this case need not reflect the relevant labor pool as precisely as in a Title VII case because "[i]n *Hazelwood* and in *Local 14* ... the court was concerned with a statistical basis for a finding of discrimination. Here we have no such problem, discrimination having been established by direct evidence of long-standing practices." *Local 28,* 565 F.2d at 36.

In *Mackin v. City of Boston,* 969 F.2d 1273 (1st Cir.1992), *cert. denied,* ― U.S. ―, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993), which concerned a motion to terminate a decree, it was also necessary for the court to be particularly precise in its measurements of the relevant population so that it could determine whether the purposes of the decree had been met. Furthermore, the language of the decree in *Mackin* is quite different from that in the AAAPO. The court in that case interpreted the language of the original order, which said that the decree would be terminated when Boston "achieve[d] a complement of minorities commensurate with the percentage of minorities within the community," to mean that the decree would end when the percentage of minorities within the fire department equalled the *current* percentage of minorities in the community, not when the percentage of minorities within the department equalled the percentage of minorities in the community *as of the date of entry of the decree. Mackin,* 969 F.2d at 1276. In the AAAPO, on the other hand, "the [29.23] percent figure, as a numerical goal, is stated in absolute terms." *Patterson v. Newspaper & Mail Deliverers' Union of N.Y. & Vicinity,* 13 F.3d 33, 39 (2d Cir.1993), *cert. denied,* ― U.S. ―, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994).

### 3. Disparity in Hours
#### a. Plaintiffs' Evidence

■ Plaintiffs present their evidence regarding the disparity in hours worked between white and nonwhite journeypersons in the form of regression analyses, which are statistical tools commonly used by social scientists and increasingly accepted by the courts to determine the effect of a number of factors ("the independent variables") on a particular phenomenon ("the dependent variable"). *Ottaviani v. State Univ. of N.Y. at New Paltz,* 875 F.2d 365, 366–7 (2d Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 721, 107 L.Ed.2d 740 (1990). Dr. Siskin first developed a figure for nonwhite journeypersons' "expected" hours worked by calculating the number of hours that they would have had to work for each year from 1984 to 1991 in order for their percentage of the total hours worked by union members to equal their percentage of membership in the union. He was then able to calculate the probability that the disparity would have occurred solely as the result of chance, which he expressed in terms of standard deviations. As the number of standard deviations increases, the probability that a disparity occurred by chance decreases. *Id.* at 371; D. Baldus & J. Cole, *Statistical Proof of Discrimination* 308 (1980). When a disparity is represented by two or more units of standard deviation, there is less than a five percent chance that the variation occurred randomly, and social scientists and courts commonly deem the disparity statistically significant. *See Hazelwood Sch. Dist.,* 433 U.S. at 311 n. 17, 97 S.Ct. at 2743 n. 13 ("a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race"); *Coser v. Moore,* 739 F.2d 746, 754 (2d Cir. 1984).

Dr. Siskin found, and Dr. Buchanan agrees, that the disparity between the actual and expected hours worked by white and nonwhite journeypersons was statistically significant for each year from 1984 through 1991.[6] For every year from 1984 through 1991 the disparity was at least three standard deviations; in 1990 it was as high as

---

**6.** The plaintiffs did not submit data for the period after March 1991.

7.03 standard deviations; and for the entire period the average disparity was 14.83 standard deviations. The impact of the disparity on the lives of journeypersons has been dramatic. During the period 1984 to 1991, nonwhite journeypersons worked an average of 177 hours less than their white counterparts with the result that nonwhites earned an average of $23,332 each year, while whites earned an average of $28,192 each year.

It is possible that the variation in hours between white and nonwhite journeypersons can be accounted for by factors other than race, so the existence of a disparity alone does not provide evidence that impermissible discrimination has occurred. *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 895 F.2d 86, 90 (2d Cir.1990). In order to ascertain the role that race played in creating the disparity, Dr. Siskin ran multiple regression analyses, in which the statistician identifies all "legitimate" (i.e. nondiscriminatory) factors that might have an effect on the dependent variable and which might create the observed disparity. *Ottaviani*, 875 F.2d at 367. The assumption is that once the effects of all possible nondiscriminatory factors have been accounted for, the remaining disparity can be attributed to the discrimination for which the statistician is testing—here, racial discrimination. *Id.* Dr. Siskin hypothesized that nonwhite workers may have less seniority or fewer skills than white workers, making them less desirable employees. Alternatively, nonwhites may live primarily in New York City, where there is less work. Dr. Siskin ran regression analyses controlling for seniority, special skills and residence, and he found that the disparity between expected and actual hours worked by nonwhite journeypersons remained statistically significant for six of the eight years studied and that for the period 1984 to 1991 there remained a disparity of over nine units of standard deviation which can be attributed to the effects of racial discrimination.

Another explanation for the discrepancy in hours could be that nonwhite journeypersons choose to work fewer hours than white journeypersons. To test this hypothesis, Dr. Siskin assumed that anyone who did not work in a given year was not looking for work, and he excluded such people from his analyses. He found that a statistically significant disparity persisted for every year studied and for the entire period. To further ensure that a few individuals who were either not seeking work or who were unusually available for work did not skew the outcome, he ran the analysis excluding people with very high and very low hours. Once again he found that the disparity remained statistically significant for each year and throughout the entire period.

There is no evidence that any nondiscriminatory factors other than those accounted for by Dr. Siskin created the disparity in hours worked by white and nonwhite journeypersons, *see Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir.1988) (party challenging the validity of a multiple regression analysis on the basis that it omitted factors must identify those factors and demonstrate that they would weaken the showing made by the analysis), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989), and the court concludes that plaintiffs have presented clear and convincing evidence that nonwhite journeypersons are deprived of employment opportunities solely as a result of their race. This conclusion is supported by the regression analyses which Dr. Buchanan conducted for every six-month period from July 1988 through December 1990 and for the first five months of 1991. For each of these periods, as well as for the period from July 1988 through May 1991 taken as a whole, Dr. Buchanan's regression studies demonstrate that race played a statistically significant role in creating a disparity in hours worked by white and nonwhite journeypersons.

Dr. Buchanan attempts to camouflage this result by examining the extent to which journeypersons as a whole (not broken down according to race) work different amounts of hours and by arguing that race played a small role in these variations. This information might be relevant if the AAAPO had ordered the union to ensure that all members worked the same number of hours, but this is not what the court has ordered. The union is under an obligation to ensure that race does not play a significant role in the hours

worked by union members, and the court does not care whether other factors play a role as well. It is interesting to note, however, that Dr. Buchanan demonstrates that during every 6–month period from January 1988 to December 1990 and the 5–month period from January 1991 through May 1991, race was a more important factor than seniority or residence in the disparity in hours worked by all journeypersons.

Dr. Buchanan also attacks Dr. Siskin's methods. He notes that production and asbestos workers have one seniority as production and asbestos workers and another as sheet metal workers, and he hypothesizes that Dr. Siskin may not have controlled for this fact. As previously noted, there were very few production and asbestos workers in the union during the period of the study. *See supra* p. 651. All of Dr. Buchanan's other criticisms stem from his failure to understand Dr. Siskin's analysis, as explained previously in this opinion, *see supra* pp. 650–651, and the court finds that they lack merit.

As with the union's failure to meet the membership goal, the union criticizes the methods the plaintiffs use in proving the disparity in hours between white and nonwhite workers, but the union does not dispute that the disparity exists. Therefore, the court finds that there is clear and convincing evidence of a statistically significant hours disparity between white and nonwhite workers.

### b. Union's Liability

In 1975, Judge Werker permanently enjoined the union from taking any action which would "deprive or tend to deprive any individual of employment opportunities with Local 28 contractors. . . ." O & J ¶ 1. Specifically, he barred the union from "fail[ing] or refus[ing] to refer any individual for employment with sheet metal contractors," *id.* ¶ 1, and he ordered that "Local 28 . . . shall provide nonwhite journeymen, and apprentices of Local 28 with the same assistance, including the assistance of Local 28's officers and business agents, in obtaining employment as that provided to white members and apprentices of Local 28." *Id.* ¶ 21(g). More

recently, the AAAPO mandated that "all members . . . of Local 28 share equitably in all available employment opportunities in the industry." AAAPO ¶ 3.

In violation of these orders, the union has failed to ensure that its nonwhite employees share equitably in available employment opportunities, even when it is required by the Collective Bargaining Agreement ("CBA") to take action. Under the CBA,

Whenever, in the opinion of the Union, unemployment has risen to the point where some corrective action, in its opinion, should be taken, the Manpower Committee shall meet within forty-eight (48) hours to attempt to place the men in jobs. During periods of unemployment there shall be established a mandatory two-week furlough system. The procedures to be adopted and/or formulated concerning said furlough system shall be referred for consideration to a joint subcommittee consisting of both management and labor.

CBA, Art. 5, §§ 6, 7. Although there has been high unemployment over the past decade—the union told some minority members that it could not readmit them to the union because unemployment levels were too high, and as plaintiffs have demonstrated, minority unemployment during the period 1984–1991 rose to significant levels—the union has failed to invoke the emergency provisions. The union asserts that it could not implement either of the above measures without the consent of the contractors and that it fulfilled its responsibilities by commencing a dialogue with management regarding the problem of unemployment. The union's interpretation ignores the facts that both CBA clauses are mandatory, not discretionary, and that they both require action, not merely negotiation. The union does not assert that the Contractors' Associations actively frustrated any efforts by the union to implement the CBA measures to alleviate unemployment. In light of its failure to make a diligent effort to implement these measures, the union's claim that it has taken all possible measures to open up job opportunities to its nonwhite members appears disingenuous at best.

The union claims that on two occasions it attempted to create equal job opportunities

for white and nonwhite members. In January 1992, the union asked members who had worked throughout 1991 to voluntarily take a two-week furlough. The request, not surprisingly, was unsuccessful—the union reports that no unemployed union members were employed as a result. The union also claims that it "voluntarily implement[ed] a policy of indenturing three nonwhite apprentices for every one white apprentice." (Local 28 Mem. Opp'n to Contempt Mot. at 41.) Elsewhere in its brief, however, the union disclaims responsibility for assigning apprentices, arguing that the JAC bears sole responsibility. *Id.* at 13. The JAC's actions certainly do not constitute diligent actions on the part of the union.

In addition to failing to fulfill its affirmative responsibility to ensure that its nonwhite members have equal opportunities, the union has actively contributed to the inability of nonwhites to find work. The union has no official hiring hall, but its business agents play an important role in helping members find work—under the CBA, business agents refer members for fan maintenance jobs and for jobs with contractors from outside Local 28's area who are temporarily working inside the area.

Business agents also play an informal but nonetheless important role in helping members get other jobs. Journeypersons call business agents when they are unemployed and their names are put on a list. *See* Appendix C. Business agents use the lists to refer journeypersons for work, although they do not necessarily refer in the order in which the journeypersons have called them. The union denies that its agents ever help members obtain jobs (aside from fan maintenance and outside contractor jobs), but this contention is undermined by the union's admission that its agents helped eight out of seventeen of the plaintiffs' declarants find jobs.

The power wielded by the business agents is evident from the fact that O.M.C. Sheet Metal denied a job to African–American journeyperson Melbourne Pearson on the grounds that all jobs were being controlled by the union. *See* Appendix C. Similarly, African–American journeyperson Bernard Wyatt was told that only friends of a particular business agent were being hired by Triangle Sheet Metal. *See* Appendix C. After African–American Jerome Hernandez was told that there was no work at a certain jobsite, he caught a business agent getting a white man hired there for overtime work. *See* Appendix C.

Even when they do not control hiring at a work site, business agents often inform members of job opportunities. For example, business agents informed African–American journeypersons Robert Taylor and Dennis Lyght of jobs. Taylor and Lyght do not say what kind of jobs they were told about, but the union does not allege that they were referred solely for fan maintenance jobs or for work with outside contractors.

Although business agents often help members find work, they help nonwhite journeypersons only sporadically—just before a union election, or after they have reported a violation of the CBA, for example. Several nonwhite journeypersons have never been helped by the union to find jobs. Since the union plays an active role in connecting some members with jobs, and since it fails to help many of its nonwhite members, it cannot absolve itself of responsibility for the inability of its nonwhite members to find work.

The union argues that hiring decisions are made by contractors and that the hours disparity can only provide the basis for a contempt citation if it is shown that the union is the sole cause of the disparity. In making its argument, the union confuses the court's contempt powers with its powers under Title VII. It has been conclusively shown in the past that the union has discriminated against nonwhites on account of their race in violation of Title VII and the Constitution. As a result, the court has imposed an affirmative obligation upon the union to ensure that nonwhites are not deprived of equal employment opportunities. Consequently, even if the union is not solely responsible for the continuing failure of nonwhites to find work as journeypersons, it is liable for the disparity in hours unless it can show that it has made diligent efforts to ensure equal work opportunities for all of its members.

Since the union is being held responsible for its own actions, the court does not find it necessary to address the union's contentions that there is no master-servant relationship between it and the Contractors' Associations and that they do not constitute an integrated enterprise.

### 4. Reinitiation Policy

#### a. The Policy

Local 28 requires its members to pay monthly dues [7] in advance in order to maintain membership in good standing. Art. 10, Section 2(f) of the Constitution and Ritual of the Sheet Metal Workers Int'l Ass'n ("Constitution and Ritual"). If a member does not pay his dues within two months, he is automatically suspended from membership and is subject to the following requirements of Article 16, Section 10 of the Constitution and Ritual:

Any member who becomes two (2) months in arrears shall be recorded suspended . . . without notice and under no circumstances shall any extension of time be granted. No back dues shall be accepted from any member suspended in accordance with this Section and no official receipt shall be issued to record such dues after the expiration of the two (2) month limit or predated to avoid suspension.

A member suspended in accordance with this Section shall forfeit all rights, privileges, and benefits of membership including funeral benefits. He shall not be permitted to participate in any meetings or in any affairs of this Association or of any local union or council affiliated therewith during the period of suspension nor shall any local union or this Association accept or record any dues or per capita tax from such member either during or after such suspension to be applied to the period of suspension.

Article 16, Section 11(a) states,

Any member (other than an apprentice-member) who is suspended in accordance with Section 10 of this Article, who is otherwise eligible to membership, shall, within two (2) months from the date of such suspension, be reinstated upon the payment of a local reinstatement fee of not less than Twenty–Five Dollars ($25.00), plus dues in advance beginning with the month of reinstatement,[8] provided such reinstatement fee and dues are actually paid and properly recorded on official receipts within two (2) months from the date of suspension. Such reinstatement shall not restore to such member any right to funeral benefits or any other membership rights established prior to suspension.

Therefore, in order for a suspended member to be reinstated he must pay $25.00 for local reinstatement, one month's dues in advance, and dues for every month he was in arrears, including the initial two months which led to his suspension. If a delinquent member, who is otherwise eligible for membership, does not apply for reinstatement within the two month period following the date of suspension, that member forfeits his right to reinstatement and must apply for reinitiation pursuant to Article 16, § 2 of the Constitution and Ritual. Art. 16, § 11(a).

The union claims to have adopted a policy at the end of 1988 which prohibits members who have been suspended for over two years for non-payment of dues from being reinitiated, unless the union's Executive Board decides otherwise via an appeal process. At this point the member is considered terminated. However, there is no documentation confirming that this reinitiation policy was ever officially adopted. Minutes from a Local 28 Executive Board meeting held on November 2, 1988 state, "[a] motion was made that effective 12/1/88 a policy to set forth that members who were suspended from membership for non-payment of dues for a period that exceeds two years shall not be permitted to return to membership." The minutes make no mention of any final disposition of the motion or the existence of an option to

---

7. Dues are $51.00 per month or $270.00 per six month period.

8. In order for the reinstatement to be recorded at the General Office, the suspended member must also pay a $15.00 International reinstatement fee or 40% of the local reinstatement fee, whichever is greater, as well as the International's per capita tax.

appeal to the Executive Board. Upon inquiries from the plaintiffs and then from the Administrator, the union claimed that "[s]aid policy permits a suspended member (in excess of two years) to appear before the Executive Board in consideration of their respective application(s) for reinitiation." (Letter from D'Elia to Raff of 6/29/92, at 1.) However, the policy does not state what criteria or standards the Board should or does use in its decisionmaking, giving the Board unfettered discretion when considering candidates for reinitiation.

There is no evidence that the union ever disseminated information about this policy to its membership. The union admits that the Constitution and Ritual is the only written documentation distributed to Local 28's membership regarding its reinstatement policy. (Letter from D'Elia to Klein of 5/11/92, at 1.) However, the Constitution and Ritual mentions nothing about a restrictive reinitiation policy for those members suspended for more than two years for non-payment of dues.

The union claims that according to the records it keeps in the regular course of business, there is not a single member who came before the Executive Board and paid the requisite fees who was ultimately denied reinitiation during the 1984–1991 period. However, at least two nonwhite members were denied reinitiation and one was allegedly discouraged from applying, while white members were granted reinitiation during this period.

Neither of the parties asserts that the O & J or the AAAPO are unclear as to the union's obligation to refrain from racially discriminatory membership policies. Pursuant to paragraph 1 of the O & J, the union and its officers "are permanently enjoined from engaging in any act or practice which has the purpose or the effect of discriminating in . . . admission to membership in Local 28 . . . on the basis of race, color or national origin." Pursuant to paragraph 11 of the O & J and paragraph 3 of the AAAPO, the union must make "regular and substantial progress" to-

ward achieving the 29.23% nonwhite membership goal.

### b. Disparate Impact

■ The union's adoption of its restrictive reinitiation policy has the effect, if not purpose, of discriminating against non-whites in their readmission to the union, illustrating the union's clear and convincing noncompliance with the court's orders. The reinitiation policy has a disparate negative impact on nonwhites, who are overrepresented among journeypersons terminated for their inability to pay dues. From 1984 to 1991, 32.5% of the journeypersons suspended for non-payment of dues were nonwhite, while nonwhites comprised only 21% of journeypersons. While suspended whites and nonwhites were equally likely to be terminated for nonpayment of dues, the termination rate of nonwhites is almost double that of whites, (10.5% for nonwhites, compared with 5.7% for whites) because nonwhites are disproportionately suspended. A new minority journeyperson has almost a three times greater chance of having left the trade after 8 years than his white counterpart does.

Furthermore, there is a clear relationship between lack of work and termination for non-payment of dues. A member who is in the bottom 10% of journeypersons in terms of hours worked per year is four times more likely to be suspended the ensuing year and ultimately terminated than a member not in the bottom 10%. Hence, the hours disparity between whites and nonwhites, see discussion supra pp. 660–662, contributes to the disproportionate suspension and termination rates of nonwhites. Defendant's expert, Dr. Buchanan, is correct when he says that "[n]on-[w]hite journeymen do leave the union at a higher rate, but not just because they are [n]on-[w]hite," (Buchanan Aff. ¶ 59,)—they leave because they are unemployed, for which the union is partially responsible. An African–American member, Travers Everson, for example, was unable to find work for two years, resulting in his termination for inability to pay dues. Another African–American member, Eric Thomas, made valiant efforts to find work to no avail. He, too, was unable to pay dues even with sub-fund

benefits,[9] resulting in termination from the union.

Dr. Buchanan tries to mislead the court by arguing that race accounts for a small variance in the suspensions among all union members, while recognizing that "there is a raw racial disparity in suspension rate" between whites and nonwhites. (Buchanan Aff. ¶ 54.) The fact that "[r]egular [h]ours is the major variable affecting suspension," (Buchanan Aff. ¶ 54), does not contradict the argument that race affects suspension, because regular hours and race are directly related. As has been shown, there is a significant hours disparity for nonwhites which increases their suspension rate. Thus, Dr. Buchanan's findings only bolster the court's finding of discrimination.

Furthermore, the percentage of nonwhite apprentices entering the union has increased over time, masking the dismal termination rate of nonwhites due to unemployment.

### c. Disparate Treatment

The reinitiation policy is applied differently to whites and nonwhites. Initially, the union denied that any of its members, upon meeting the policy's requirements, were refused reinitiation. It appears, however, that minority members suspended for over two years have been denied the opportunity to reenter the union because of the high unemployment rate, while their white counterparts have been able to rejoin.

For example, in December 1991 Michael Brown, an African–American former member, sought readmission into Local 28 and was rejected due to a 35% unemployment rate in the union. Brown met with the Executive Board in December 1991 to seek reinstatement, however, Recording Secretary Joseph Casey[10] rejected his application, stating that the union's decision was "predicated on the present members unemployed in the Union." (Letter from Casey to Brown of 1/16/92.) Brown claims he was never informed of the reinitiation policy.

In 1992, Oscar Matos, a Latino former member, was denied the opportunity to appeal to the Executive Board, in blatant violation of the reinitiation policy. Unemployment and short-term jobs forced him to default on his union dues. Over two years later, Matos sought reinstatement into the union so that he could accept a job offer with his former long-term employer. Matos alleges that Casey told him he could not appeal to the Executive Board because Matos was no longer a member and that it would be practically impossible for Matos to reenter the union after a three year hiatus. Matos claims he was never informed about the reinitiation policy.

Travers Everson, an African–American former member, was discouraged from reapplying to the union due to unemployment in the industry. While employed, Everson observed how minority apprentices were laid off when they became mechanics and how minority mechanics were laid off when work slowed down, while the white apprentices and mechanics remained steadily employed. Due to a wrist injury, Everson had to stop working for a six-month period but resumed his job search in August 1990. Despite visiting shops three times a week from August 1990 to the summer of 1992 and learning from apprentices that the shops were hiring mechanics, Everson was told by various forepersons that work was unavailable. This employment discrimination ultimately led to his inability to pay his union dues and to his being terminated for over two years. When Everson asked how he could get back into the union, Casey discouraged him from applying to the Executive Board for readmission, citing unemployment in the industry. Thus, between employment discrimination in the industry and lack of access to the union which could potentially alleviate this discrimination, Everson has little chance of successfully obtaining work.

While nonwhite members suspended for over two years were denied reinitiation be-

---

9. Local 28 and contractors signed an agreement establishing the Supplemental Unemployment Benefit Trust Fund ("sub-fund"), into which contractors make contributions based on the hours worked. If a sheet metal worker meets certain criteria, he is entitled to a certain sum towards payment of his dues.

10. Casey is currently the President and Business Manager of Local 28.

cause of high unemployment, were denied the opportunity to appeal to the Executive Board, and were discouraged from applying for reinitiation altogether, the union's white members suspended for over two years were granted reinitiation during the same time period, despite the policy's restrictive nature. For example, Robert Fuchs was suspended in January 1985 and reinitiated in September 1991, and James O'Connor, Jr. was suspended in January 1984 and reinitiated in February 1989. The union justifies their reinitiation based on the assertion that they were owner/members. The union claims that Carl Beck was never suspended but was in fact transferred, despite union records showing him suspended in 1984 and reinitiated in 1990.

Local 28's explanations for the disparate treatment of its white and nonwhite suspended members are unconvincing. Allegations of drug use on the part of nonwhites and the characterization of reinitiated whites as owner/members, for example, does not serve to clarify the inequitable application of the reinitiation policy. Nonwhites were not given the opportunity to appeal to the Executive Board, and the union selectively used the unemployment rate to bar readmission to nonwhites. Such inconsistencies suggest that the union's rationalizations are a pretext for discriminatory treatment. Furthermore, given the union's affirmative duty to make "regular and substantial progress" toward achieving the 29.23% nonwhite membership goal, O & J ¶ 11; AAAPO ¶ 3, the union acted contemptuously when it discouraged its former minority members from seeking reinitiation and failed to take affirmative measures to ensure their reinitiation.

Local 28 was not reasonably diligent and energetic in its compliance. The union has an affirmative duty to try to make its membership procedures and policies more inclusive. It is not sufficient for the union to establish a facially neutral reinitiation policy which prevents nonwhites from reentering, and it is even worse for the union to then selectively apply this policy based on race.

*D. Diligence*

The union asserts generally that it has made a good faith effort to comply diligently with the AAAPO and O & J, but this argument is not convincing. First, the union draws attention to the fact that since 1983 it has "contributed" $1,129,730.32 regularly to the Employment, Training, Education, and Recruitment ("ETER") Fund. This fund was set up pursuant to a court order as part of a contempt finding. It is financed by an initial contempt fine of $150,000 and an additional payment that the union must make for each hour that its members work until the union achieves the nonwhite membership goal and the court finds that the fund is no longer necessary. The fund is thus financed entirely by contempt fines. *See Local 28*, 478 U.S. at 444, 106 S.Ct. at 3033–34 (holding that the fines that the union pays into the fund are civil contempt sanctions). The union practices perverse logic when it claims that the fines it has paid as a result of its continued contempt of court orders provide evidence of its attempts to comply with those orders.

Similarly, the union draws attention to the fact that since 1983 it has paid Administrator Raff $554,457 to oversee implementation of the AAAPO. Judge Werker ordered the union to pay the Administrator's compensation and expenses pursuant to a finding that the union had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a). The remedy was imposed as part of a group of measures intended "to compel compliance with the letter and spirit of civil rights legislation." *Local 28*, 401 F.Supp. at 488. Like the contempt fines that the union pays into the ETER Fund, the Administrator's compensation serves as a testament to the union's refusal to comply with both the law and this court's orders, rather than as evidence of good faith efforts by the union.

The union also claims that its stipulations to implement a hiring hall and work share system, to implement a recordkeeping system, and to alter its reinitiation policy are part of its diligent efforts to comply with the AAAPO. The union did not enter into negotiations regarding these stipulations, however, until the plaintiffs had instituted contempt proceedings against them, and a "spurt of activity on the heels of plaintiffs'

motion for a finding of contempt" is not evidence of a diligent effort to comply. *Aspira of N.Y., Inc.*, 423 F.Supp. at 654.

Furthermore, it is difficult to view the hiring hall and work share stipulation as evidence of the union's diligent efforts in light of the fact that although the union claims that it signed the stipulation "in a good faith effort to fulfil its obligations under AAAPO [sic]," (Local 28 Reply Mem. to Contractors' Opp'n to Proposed Stip. & Order at 25), the union attempts to undermine the stipulation in its memoranda of law and its officers' affidavits. The union asserts that the work share program "violates Title VII and the United States Constitution," (Local 28 Mem. in Opp'n to Contempt Mot. at 93), and that it "cannot be implemented without the consent of the employers or a modification of the collective bargaining agreement." (Local 28 Reply Mem. to Contractors' Opp'n to Proposed Stip. & Order at 25.) By signing and asking the court to approve a stipulation that it believes is unconstitutional and violates Title VII, the union evinces disrespect for the court and scorn for this nation's civil rights laws. Similarly, the reinitiation policy stipulation, with its many penalties for nonwhite journeypersons attempting to re-enter the union, cannot be seen as an example of a diligent effort by the union to comply with this court's orders.

### III. Contempt Remedies

#### A. Financial Remedies

■ A civil contempt remedy may be coercive or compensatory, but it may not be punitive. *Local 28*, 478 U.S. at 443, 106 S.Ct. at 3033; *Hess v. N.J. Transit Rail Operations, Inc.*, 846 F.2d 114, 115 (2d Cir.1988). In fashioning a coercive contempt remedy, a district judge should consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987). The contemnor does not have the burden of production on the issue of financial

resources, *id.* at 110 n. 3, but the contemnor's failure to provide information about his financial resources "may not be charged against the [plaintiffs] or result in a holding that the district court abused its discretion in imposing the sanction." *U.S. v. Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir.1987), *cert. denied sub nom. Arambulo v. United States*, 485 U.S. 1039, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988); *New York State Nat'l Org'n for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). These factors are merely guidelines, *Grand Jury Witness*, 835 F.2d at 443, and a district judge's equitable powers give him great discretion to fashion a remedy that will bring the contemnor into compliance. *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982). Additionally,

> [i]n a discrimination action the 'societal interest in compliance with the judgments of the federal courts' is supplemented 'by the governmental interest in eradicating ... discriminatory practices.' ... As a result, the court may employ the equitable discretion it gains from the continuing jurisdiction provisions of the Consent Judgment.... as well as the court's 'broad power ... to fashion the most complete relief possible to remedy past discrimination.'

*Local 580*, 669 F.Supp. at 611 (cites omitted).

■ The standards are different for compensatory remedies. When a party can show that it has suffered injury as a result of another's violation of a court order, the district judge "is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979). A compensatory remedy should "reimburse the injured party for its actual damages." *New York State Nat'l Org'n for Women*, 886 F.2d at 1353. When contempt fines are levied with a compensatory goal, "some proof of loss must be present to justify its compensatory aspects," although the complainant does not have a great evidentiary burden. *Id.* at

1353–54. Since a compensatory remedy is imposed in order to erase the effects of a violation of the complainant's rights, the court need not take the contemnor's financial resources into account.

■ The union contends that the imposition of any financial remedies in addition to those it has already undertaken will threaten its financial viability. It offers as evidence for this contention a report by Gary Topple, a certified public accountant ("Topple report"), purporting to show that the union's financial situation is so precarious that it cannot afford *any* additional expenses. The report is so general and relies on so many assumptions, however, that it constitutes a blanket denial of the union's ability to pay rather than a realistic analysis of the union's financial situation. For example, it asserts that the union cannot reduce its operating expenses because it has already taken "maximum cost cutting techniques," but it does not say why more cannot be taken. (Topple Aff. in Opp'n to Contempt Mot. at 5 n. 3). It estimates that in 1994 revenues would stay the same while expenses increase, but it does not state the basis for this assumption. It makes dire predictions regarding the impact that the unemployment of 600 members would have on the union's financial situation in the coming years but it does not say whether there is any reason to believe that so many members will be unemployed. Although the court takes the union's financial resources into account in imposing coercive remedies, it does not base its analysis upon the Topple report.

### 1. Back Pay to Remedy the Hours Disparity

■ As a remedy for the union's failure to ensure equal employment opportunities for its nonwhite journeyperson members and for its practice of helping white journeypersons but not nonwhite journeypersons find jobs, the plaintiffs have requested that the union be ordered to pay back pay for each nonwhite journeyperson whose hours are two or more standard deviations below the norm.

■ Back pay can be an appropriate remedy for civil contempt. *See, e.g., EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers,* No. 71 Civ. 2877, 1988 WL 131293 (S.D.N.Y. Dec. 16, 1988) (Carter, J.) (granting back pay to nonwhite journeypersons or applicants who can prove that they were discriminated against by Local 580 in recruitment, selection, employment opportunities, or termination in violation of court order); *United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46,* 328 F.Supp. 429 (S.D.N.Y.1971) (Frankel, J.). Although in the Title VII context a court must find actual discrimination before awarding back pay, when back pay is a remedy for civil contempt a court need only establish that a court order has been violated and that back pay is necessary either to coerce compliance or to remedy the contempt. *EEOC v. Guardian Pools, Inc.,* 828 F.2d 1507, 1516 (11th Cir.1987).

Back pay has been awarded twice before in this case. In 1975, after a trial, Judge Werker found that Local 28 had violated Title VII and ordered it to compensate applicants who had been denied admission to the union because of their race or nationality. *Local 28,* 401 F.Supp. at 491. Twelve years later, back pay still had not been issued to a number of claimants, so the court consolidated all of the back pay claims into one hearing. In an order setting the standards for granting back pay, the court ordered that back pay be given to apprentices who were underemployed after being admitted to the union, on the grounds that they were "Local 28 members in name only. The union afforded them none of the actual benefits of membership that would justify setting a cap on their damages as of the date of their admission." *Local 28,* 674 F.Supp. at 105.

The rationale for granting back pay now is much the same as it was in 1987. The union has failed to treat nonwhite journeypersons as members, with the result that many are underemployed. Its failure to provide equal employment opportunities to its nonwhite members and to give its nonwhite members the same assistance of its officers and business agents as it gives its white members places it in contempt of this court's orders. Therefore, the union is liable to its nonwhite journeyperson members for their inability to find work.

The union's liability for back pay will serve both coercive and remedial purposes. Back pay meets all three criteria for coercive sanctions. First, the contumacious conduct is of great magnitude. The union has failed to provide equal employment opportunities for its nonwhite journeyperson members since entry of the O & J in 1975. As a result, nonwhite journeypersons have been deprived of income—for each year from 1984–1991 they earned on average almost $5,000 less than their white counterparts. If the union takes no action, this disparity will continue. Secondly, a back pay sanction promises to be effective in bringing about compliance where injunctions have failed because it is the union's business agents, whose salaries will be affected if the union is fined, who are primarily responsible for the failure of nonwhite journeypersons to find work. Thirdly, providing back pay will surely place a great burden on the union, but this factor weighs in favor of imposing the sanction because the union's record of disregarding this court's injunctions indicates that a financial burden is necessary to induce the union to comply. Furthermore, because back pay will serve an important remedial purpose, it is too late for the union to protest that back pay will impose an excessive burden on it. The union "should have thought about the cost of remedial action while they were blatantly ignoring the [O & J and AAAPO] for [almost twenty] years." *Local 580,* 669 F.Supp. at 624.

## 2. ETER Fund Contribution

The membership goal has now been in effect since 1975. A pattern has developed in which the union fails to meet the membership goal and the court extends the deadline, as it does today. Since 1982, the union has been required to contribute to the ETER Fund for every hour that its members work until it reaches the goal. This was intended in part as a coercive measure to induce the union to increase its nonwhite membership, *Local 28,* 753 F.2d at 1184, and it has been

partly successful—the nonwhite membership percentage is rising slowly. However, the court originally ordered the union to achieve the nonwhite membership goal by 1981, not sometime in the distant future. The rate of improvement has been excruciatingly slow. Furthermore, the ETER Fund has never been fully funded, which has had an adverse impact on its ability to achieve its remedial goals, including its mission of "provid[ing] financial support for out-of-work nonwhite journeymen to encourage them to stay in the trade and upgrade their skills." [11] *Local 28,* 753 F.2d at 1178. Therefore, the court will empower the Administrator to raise the amount that the union is required to contribute to the ETER Fund to a level that will fund the activities that the Fund was intended to carry out and will also coerce the union to comply.

## 3. Fees and Costs

 The plaintiffs seek payment of the attorneys' fees, court costs and experts' fees that they incurred in investigating and pursuing this contempt motion. "Plaintiffs, whose rights were violated, should not be forced to bear the costs of vindicating those rights and enforcing the Court's orders." *New York State Nat'l Org'n for Women v. Terry,* 737 F.Supp. 1350, 1364 (S.D.N.Y.1990) (Ward, J.), *rev'd in part on other grounds,* 961 F.2d 390 (2d Cir.1992), *and vacated on other grounds sub nom. Pearson v. Planned Parenthood Margaret Sanger Clinic,* —— U.S. ——, 113 S.Ct. 1233, 122 L.Ed.2d 640 (1993). Consequently, plaintiffs may recover reasonable attorneys' fees and costs incurred in prosecuting contempt where the contempt was willful. *Amity Leather Prods. Co. v. RGA Accessories, Inc.,* 849 F.Supp. 871, 875 (S.D.N.Y.1994) (Carter, J.), *aff'd,* 22 F.3d 1091 (2d Cir.1994); *Vuitton et Fils S.A.,* 592 F.2d at 130. Contempt is willful where the contemnor had actual notice of the court's order, *Vuitton et Fils S.A.,* 592 F.2d at 131,

---

11. A further reason that the ETER Fund has not been effective at keeping nonwhite journeypersons in the union is that journeypersons have not had access to the Members Assistance Program counselors that the ETER Fund provides for apprentices. *See EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n,* No. 71 Civ. 2877, Order Establishing an Employment, Training, Education & Recruitment Fund ¶ 6(d) (S.D.N.Y. Aug. 31, 1983) (Werker, J.) ("ETER Fund Order"). Access to those counselors may encourage non-white journeypersons to remain in the union despite underemployment and other adversity.

was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply. *Andre Matenciot, Inc. v. David & Dash, Inc.*, 422 F.Supp. 1199, 1211 (S.D.N.Y.1976) (Motley, J.). An award of attorneys' fees serves both coercive and remedial functions. The remedial nature of the award means that the court need not take the contemnor's ability to pay into account in awarding fees and costs. *Lasky v. Quinlan*, 426 F.Supp. 682, 683 (S.D.N.Y. 1976) (Werker, J.), *vacated on other grounds*, 558 F.2d 1133 (2d Cir.1977).

Here, the union has made no effort to have the consent decree modified, it has not presented plausible evidence that it made a good faith effort to comply, and compliance was not impossible. Therefore, the contempt was willful and attorneys' fees and costs are an appropriate remedy.

█ A costs award in a contempt case may include expenses incurred by the plaintiffs in investigating the contempt. *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 400 (3d Cir.1994); *New York State Nat'l Org'n for Women*, 737 F.Supp. at 1363. In this case, the plaintiffs hired a statistical expert at great expense to show that the union has failed to reach the membership goal and that nonwhite journeypersons are underemployed. The expert's efforts to analyze the data provided by the union were greatly hampered by the sloppiness and incompleteness of that data, and as a result his study was considerably more time-consuming and expensive than it would otherwise have been. In light of the fact that this extra effort was necessitated solely by the union's contemptuous conduct in failing to adequately maintain the records required by the AAAPO, it is appropriate for the union to pay the costs incurred by the plaintiffs' statistical expert in analyzing the membership goal and the hours worked by nonwhite journeypersons.

The plaintiffs are also entitled to fees and costs pursuant to 42 U.S.C.A. § 2000e–5(k) (Supp.1994) because this remains a Title VII case. *Local 28*, 1982 WL 445, at *4. Since the court's inherent contempt powers provide an adequate basis for the award, however, the court will not explore this claim.

## B. Hiring Hall and Work Share Program

The plaintiffs and the union have submitted a stipulation in which the union agrees to institute a hiring hall and work share program, in response to which the plaintiffs agree to withdraw their request for the court to order the institution of those measures. *See* Appendix A. According to this stipulation, the union would pay for an independent monitor, to be selected by the Administrator from candidates proposed by the parties, who would operate a hiring hall, from which all contractors would hire at least 80% of their journeypersons each year. The journeyperson with the least number of hours worked during the previous twelve-month period would be at the top of the list and would be referred out first, while the journeyperson with the greatest number of hours worked during the same period would be at the bottom of the list and would be referred out last. If two journeypersons had worked the same number of hours during the relevant period their ranks would be determined according to the hours they had worked during the previous twenty-four month period. Unemployed journeypersons would call in to report that they were unemployed, and they would be available during the hours of 3:00 p.m. and 5:00 p.m. to receive assignments. Employers would call in to report how many journeypersons they needed and give pertinent information about the job and whether they require journeypersons with special skills, in which case the journeyperson with the least hours worked during the relevant period who possessed the required skill would be referred out, and so on in numerical order. Contractors would be allowed to terminate journeypersons at will. Those journeypersons laid off by three consecutive employers for nonproductivity would be placed at the bottom of the hiring hall list, unless they were found to be unqualified to perform a special skill, in which case their skills would be reclassified and they would be ranked according to hours worked.

The work share system would go into effect if a) after the hiring hall had been in effect for a year the expected number of hours worked by minority journeypersons were more than one standard deviation below

the expected number and b) unemployment among union members had averaged 10% or more. Under this system, contractors would be able to designate up to 20% of their workforces as basic. Journeypersons who are not part of the basic workforce would be laid off and returned to the hiring hall after working for 1200 hours during a fifty-two week period. Journeypersons who were part of a basic workforce would be laid off after working 1680 hours during a fifty-two week period. Once a journeyperson is laid off, he is placed in the hiring hall according to the number of hours worked and may not be hired outside of the hall until the 52–week period has elapsed. After the 52–week period has ended, each employer can use the 20% hiring that it would be permitted to conduct outside of the hiring hall system to rehire journeypersons who it had laid off pursuant to the work share plan. Contractors would be exempted from the work share system if they demonstrated that they employed an average of three or fewer journeypersons during the 52–week period prior to institution of the system, or if they could show that the percentage of regular hours worked by nonwhite journeypersons and the percentage of overtime hours worked by nonwhite journeypersons for that contractor were either equal to or greater than the percentage of nonwhite journeyperson members in the union during the relevant prior fifty-two week period. A statistical expert chosen by the plaintiffs and funded by the union would determine every fifty-two weeks whether the work share program was still necessary.

### 1. The Work Share Plan Does Not Violate Equal Protection

■ The Contractors' Associations and the union argue that the work share plan violates Title VII and the Equal Protection Clause of the Fourteenth Amendment on the grounds that it requires layoffs of white workers. The defendants err in citing the Fourteenth Amendment, which applies only to action by the states. *United Steelworkers of America v. Weber*, 443 U.S. 193, 200, 99 S.Ct. 2721, 2725–26, 61 L.Ed.2d 480 (1979). Since the order here will be issued by a federal court, the issue is rather whether the plan violates the Equal Protection clause of the Fifth Amendment.

Title VII and the Fifth Amendment set slightly different standards for race-based court orders. Section 706(g) of Title VII, 42 U.S.C. § 2000a–5(g), allows courts to order race-based remedies for past discrimination whenever "an employer or labor union ... has engaged in persistent or egregious discrimination," when necessary "to dissipate the lingering effects of pervasive discrimination," and perhaps in other circumstances. *Local 28*, 478 U.S. at 476, 106 S.Ct. at 3050 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.). The standard that a court should apply is "whether affirmative action is necessary to remedy past discrimination in a particular case" and whether the orders "fit the nature of the violation [the remedy] seeks to correct." *Id.*

■ The Fifth Amendment also permits courts and other government bodies to use race as a classification in order to remedy past discrimination. *Id.* at 480, 106 S.Ct. at 3052. Race-based court orders are subject to an elevated level of scrutiny, but the Supreme Court has not established a consistent standard for these cases. *United States v. Paradise*, 480 U.S. 149, 166, 107 S.Ct. 1053, 1063–64, 94 L.Ed.2d 203 (1987). Supreme Court jurisprudence in this area has become increasingly contradictory in recent years. In *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a majority of the Court seemed to hold that all race-based classifications, even those used for remedial purposes, were subject to strict scrutiny. More recently, in *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990), a majority of the Court held that benign racial classifications used by Congress are subject to intermediate scrutiny. Whatever the standard, the work share system passes constitutional muster because it serves a compelling state interest and is narrowly tailored to meet that interest. In assessing whether a remedy is narrowly tailored, the court examines "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relation-

ship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise,* 480 U.S. at 171, 107 S.Ct. at 1066 (plurality op.).

A plurality of the Supreme Court has held that the union's discriminatory practices in this case have been "egregious" enough to allow the court to order affirmative action. *Local 28,* 478 U.S. at 476–477, 106 S.Ct. at 3050–51 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); *id.* at 438–484, 106 S.Ct. at 3030–54 (Powell, J., concurring). They also found that this discrimination has been sufficiently compelling to satisfy the Fifth Amendment. *Id.* at 480–481, 106 S.Ct. at 3052–53 (opinion of Brennan, Marshall, Blackmun and Stevens, JJ.); *id* at 484–485, 106 S.Ct. at 3054–55 (Powell, J., concurring). The Court found that the union's "foot-dragging resistance" to court orders enhanced the need for affirmative action. *Local 28,* 478 U.S. at 476–477, 106 S.Ct. at 3050–51 (opinion of Brennan, Marshall, Blackmun and Stevens, JJ.); *see also id.* at 438–484, 106 S.Ct. at 3030–54 (Powell, J., concurring). The court finds elsewhere in this opinion that the violations of Title VII have continued. The fact that the violations have persisted for another eight years means that the government interest is even more compelling now than it was formerly.

The hiring hall and work share system is necessary to remedy the discrimination because the union continues to refuse to provide equal employment opportunities for its minority members and because none of the previous measures ordered by the court to combat this discrimination have succeeded. For almost twenty years, the union has been under court order to ensure that its minority members receive opportunities for employment equal to those of their white colleagues in the union. *See* O & J, ¶ 1; *see also* AAAPO, ¶ 3. As the court has issued specific orders to carry out this goal, the union has constantly worked to maintain an all-white workforce. Up through the 1970's, the union denied membership to nonwhites. In 1975, the court ordered the union to admit nonwhites into the union by opening the apprenticeship program to them and setting up a job referral system to ensure that all appren-

tices shared equally in work opportunities. *Local 638,* 421 F.Supp. at 604. In an attempt to continue to prevent nonwhites from working, the union underutilized apprentices and failed to recruit new apprentices. This avenue of discrimination was restricted by a court order which required contractors to hire one apprentice for every four journeypersons and which required the union to actively recruit minority members. (AAAPO ¶ 43.)

Now mechanisms are in place which ensure that the union will admit nonwhites as apprentices and provide them with employment through the job referral system. There are no mechanisms to ensure equal employment for nonwhites once they become journeypersons, however, and this is where the union is currently able to discriminate most effectively. As discussed *supra* pp. 660–662, nonwhites on average work fewer hours than white journeypersons, with the result that nonwhites earn less money and are more likely to leave the union, *supra* pp. 665–666. The union has not taken any measures to diminish the disparity in hours, and union business agents are themselves partially responsible for the disparity.

The hiring hall system would require the union to wield its job-referral power on behalf of its nonwhite members as it does for its white members. As discussed later, *infra* pp. 679–682, the hiring hall would not have an unduly large impact on the sheet metal industry because it would merely formalize the role that the union already plays in helping members find jobs, and it would do so according to a system used by many other sheet metal local unions.

It is possible that after the hiring hall goes into effect depressed economic conditions in the industry will mean that contractors` will not look to it to fill many new jobs. In this event, the hiring hall will not reduce the disparity in hours between whites and nonwhites, and further steps will be necessary to remove the effects of the union's discrimination. Consequently, the parties have stipulated that if more than ten percent of journeypersons are unemployed after the first year and there is a significant disparity between the percentage of hours worked by

nonwhite workers and the percentage they are expected to work given their representation in the union, a work share system will be implemented.

The court finds that a hiring hall and work share system is necessary to remedy the union's past and continuing discrimination, but it rejects the form in which the parties have proposed it. The current proposal allows contractors to keep 20% of their workforce for up to 1680 hours per journeyperson each year, but it does not offer any avenue of relief for contractors for whom losing their basic workforce after 1680 hours or their non-basic workforce after 1200 hours would be disastrous. Nor does it offer an exception for those contractors with basic workforces exceeding 20% of their total workforce. Contractors should be allowed to request exemptions from the Administrator whenever they face any of these hardships.

There is no need to exempt from the work share requirement those contractors whose workforces are racially balanced, because the work share system attempts to remedy discrimination by the union, not by the contractors. Furthermore, the court has serious concerns about whether the work share system can function if too many contractors are exempted from it.

The stipulation requires that whenever the union or any contractor fail to comply with the work share or hiring hall provisions that party will be assessed liquidated damages. The court rejects this provision as violative of the contractors' due process rights. They have not been found guilty of contempt, and the court will not impose a contempt penalty on them. If any contractor does frustrate the operation of the hiring hall and work share system, however, the plaintiffs will be fully entitled to seek contempt sanctions against the offending party, and the Administrator may also take the initiative to propose that the court impose contempt sanctions. See AAAPO ¶ 62; O & J ¶¶ 14, 21(g).

Additionally, there are several practical problems with the work share and hiring hall plan. First, the hiring hall proposal ranks journeypersons solely according to hours worked the previous year. Consequently, employees will go through long periods of unemployment followed by periods of intense employment as they amass many hours in one year, the next year go to the bottom of the list and work few hours, and the next year go back to the top of the list. In order to distribute employment opportunities more equally, the ranking system should take into account both hours worked in the previous year and hours worked during the current year.

Second, journeypersons should not have to be accessible by telephone between 3:00 p.m. and 5:00 p.m. each day while they are not working in sheet metal jobs, as this provision might preclude them from working at other jobs during this time. A more convenient system for notifying journeypersons of potential jobs could involve setting evening or morning hours as the notification time or having journeypersons call in to a central office each day.

Once these defects have been remedied, the hiring hall and work share program will be narrowly tailored to address the effects of the union's discrimination.[12] Both the hiring hall and the work share system function solely as a remedy for the union's past discrimination, see Local 28, 478 U.S. at 487, 106 S.Ct. at 3056 (Powell, J., concurring); see also Paradise, 480 U.S. at 170 n. 20, 107 S.Ct. at 1066 n. 20 (approving an affirmative action plan because it was designed not to achieve a strict racial balance but rather to remedy racial imbalances resulting from the union's past and continuing discrimination against its nonwhite members), not as a remedy for societal discrimination. Compare Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274–276, 106 S.Ct. 1842, 1847–48, 90 L.Ed.2d 260 (1986). The plaintiffs' regression analyses demonstrate that there is a large disparity in hours worked by white and

12. The contractors and the union focus their constitutional and Title VII criticism on the work share scheme and do not dispute that the hiring hall is narrowly tailored to meet the union's discrimination. (Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, May 9, 1994, at 34; Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, Aug. 26, 1994, at 16; Local 28's Mem. in Opp'n to Pls.' Contempt Mot. at 92).

nonwhite journeypersons that is attributable to race, and it is clear that the union's practice of helping white journeypersons find work and refusing to help nonwhite journeypersons has contributed to this disparity. The work share system uses race only "to assist ... [the] court in determining whether discrimination has been eradicated." *See Local 28,* 478 U.S. at 487, 106 S.Ct. at 3056 (Powell, J., concurring). Work sharing will be triggered only if over 10% of the union's members enrolled in the hiring hall are unemployed and the number of hours worked by minority journeypersons during the year is less than the expected number given the percent of minority journeypersons in the union, and it will end as soon as minority journeypersons are working the expected number of hours. The percentage used in the trigger is drawn from the percentage of nonwhites in the union and is thus "directly related to the percentage of nonwhites in the relevant work force." *See id.* Additionally, if the monitor determines that the union has ended its discriminatory practices, the work share program will not go into effect.

The work share program will be flexible, allowing those contractors facing extreme hardship to opt out, and allowing contractors to hire employees with special skills. Furthermore, all provisions of the stipulation are subject to revision by the Administrator if the work share program and hiring hall do not correct the disparity of hours based on race. *See Local 28,* 478 U.S. at 478, 106 S.Ct. at 3056 (opinion of Brennan, Marshall, Blackmun and Stevens, JJ.) (approving race-based membership goal on the grounds that it had been adjusted to account for economic hardships and other legitimate reasons for failure to comply); *Paradise,* 480 U.S. at 177–178, 107 S.Ct. at 1069–70 (approving race-based remedy because it allowed for external forces such as budget cuts and was "flexible, waivable, and temporary in application").

The work share program will end once it is no longer needed to distribute fair job opportunities to nonwhites, just as the "[p]referential selection of [union members] will end as soon as the percentage of [minority union members] approximates the percentage of [minorities] in the local labor force." *Local 28,* 478 U.S. at 479, 106 S.Ct. at 3051 (opinion of Brennan, Marshall, Blackmun and Stevens, JJ.), *citing Weber,* 443 U.S. at 208–209, 99 S.Ct. at 2729–30. Consequently, it will be within the union's power to ensure that the program ends quickly because "the term of its application is contingent upon the [union's] own conduct." *Paradise,* 480 U.S. at 178, 107 S.Ct. at 1070.

The Contractors' Associations argue that the Supreme Court held in *Wygant* that the impact of layoffs on third party "innocent workers" precludes courts from employing race-based layoffs as a remedy. (Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, May 9, 1994, at 34–35.) This is simply not true. The Supreme Court has never banned the use of racially based layoffs; rather, it has cautioned that the government must "meet a heavy burden of justification when it implements a layoff plan based on race." *Wygant,* 476 U.S. at 282 n. 10, 106 S.Ct. at 1851 n. 10. The Second Circuit has indicated that it is possible to meet this heavy burden, stating that proportional layoffs may be necessary to protect progress that has already been made in integrating a workforce. *Crumpton v. Bridgeport Educ. Ass'n,* 993 F.2d 1023, 1031 (2d Cir.1993). *See also Arthur v. Nyquist,* 712 F.2d 816, 823 (2d Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3555, 82 L.Ed.2d 856 (1984) (upholding proportional layoff); *Morgan v. O'Bryant,* 671 F.2d 23, 28 (1st Cir. 1982), *cert. denied,* 459 U.S. 881, 103 S.Ct. 178, 74 L.Ed.2d 146 (1982).

The school system in *Wygant* was unable to justify the use of layoffs because of the nature of the jobs held by the employees involved. The schoolteachers in that case worked for the same employer for years and shaped their lives around the expectation of steady employment. This expectation was bolstered by a seniority system that promised the workers that as they worked longer their jobs would become more secure. After devoting several years to their jobs, seniority became their "most valuable capital asset." *Wygant,* 476 U.S. at 283, 106 S.Ct. at 1851. As the Supreme Court noted, for such workers, "[e]ven a temporary layoff may have

adverse financial as well as psychological effects." *Id.*

The sheet metal trade, along with other skilled trades, is different. Most employees work for an employer on one project which may last anywhere from several days to several years. They are laid off whenever the project ends, their part of the project is completed, or construction is halted temporarily. They often expect to be laid off during certain seasons of the year and during economic downturns. The employer may hire them back for a subsequent job, but there is no guarantee of rehiring. Unlike the employees in *Wygant*, journeypersons in the union have no seniority rights. *See Local 28*, 565 F.2d at 35 (noting that Local 28 does not have an existing seniority system and that the Contractors' Associations have conceded that "job seniority has never been the practice in the industry" (cite omitted)). A layoff in this context does not mean that the employee has lost years of capital—it is an expected development. Employees receive unemployment benefits when they leave their jobs, and many have other jobs on the side.

In contrast to the prevailing pattern, some sheet metal workers are part of an employer's basic workforce, and they work primarily for that employer. Even these long-term employees do not have a union seniority plan, unlike the schoolteachers in *Wygant*. Nonetheless, members of the basic workforce will be protected by the work share plan, because each contractor may exempt 20% of its mechanics from the 1200 hour work share requirement—these employees can work 1680 hours before work sharing kicks in.

Given the temporary nature of sheet metal jobs, the work share system will not unduly disrupt the lives of sheet metal workers. Evidence of this can be found in the fact that the sheet metal workers themselves have voluntarily agreed to institute such a system to share the burdens of unemployment among their members. *See* Collective Bargaining Agreement *supra* p. 662. Furthermore, the court has already instituted a simi-

lar program for apprentices in this case. *See Local 28*, 565 F.2d at 35.

The work share system in the stipulation resembles the hiring goals recommended by the Supreme Court in *Wygant*. The Court explained that hiring goals "impose a diffuse burden, often foreclosing only one of several opportunities." *Wygant*, 476 U.S. at 283, 106 S.Ct. at 1852. They noted that the same principle operates in the school admission cases, such as *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), where petitioner was "denied admission to the University of Washington Law School because of his race, [but] he also had been accepted at the Oregon, Idaho, Gonzaga, and Willamette Law Schools." *Wygant*, 476 U.S. at 283 n. 11, 106 S.Ct. at 1852 n. 11. Just as schoolteachers who are not hired by a particular employer and students who are denied admission to schools can seek other opportunities, sheet metal workers who have worked over 1200 hours will simply return to the hiring hall and wait for their names to come to the top of the list. They may work fewer hours, and they may work for different employers, but their careers will not be cut short abruptly. *See Weber*, 443 U.S. at 208, 99 S.Ct. at 2729–30 (approving race-based plan which did not "create an absolute bar to the advancement of white employees").

### 2. The Work Share and Hiring Hall Plan Does Not Constitute an Imposition of Contempt Sanctions on Innocent Parties

The Contractors' Associations argue that institution of the hiring hall and work share system would be unconstitutional because it would impose burdensome and intrusive relief on a party that has not been found guilty of discrimination.[13] District courts have broad powers when fashioning remedies against discrimination, as the scope of the remedy is determined by the extent and nature of the constitutional violation. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, *reh'g denied*, 403 U.S. 912, 91

---

**13.** The Contractors' Associations and individual contractors participated in negotiations with Local 28 and the plaintiffs, but later withdrew argu-

ing that the proposed stipulation would seriously damage, if not destroy, the sheet metal industry.

S.Ct. 2200, 2201, 29 L.Ed.2d 689 (1971) ("[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies"). While a court cannot order an equitable remedy against individuals who have not played an affirmative part in depriving persons of their constitutional rights, *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976), "upon an appropriate evidentiary showing" nonliable contractors and associations can be brought into a lawsuit and subjected to "minor and ancillary provisions of an injunctive order as the ... [c]ourt might find necessary to grant complete relief to respondents from the discrimination they suffered at the hands of ... [a u]nion." *General Bldg. Contractors Ass'n v. Pa.,* 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982); *see also, Milliken v. Bradley,* 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) ("an interdistrict remedy might be in order where the racially discriminatory acts of one ... school district[ ] caused racial segregation in an adjacent district.... In such [a] circumstance[ ] an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation").

The court has even more latitude in affording relief in this case because "[t]he scope of a district court's remedial powers under Title VII is determined by the purposes of the Act." *Local 28,* 565 F.2d at 34 (quoting *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). This case was originally brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* which makes an employment practice unlawful if it "would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race ...," 42 U.S.C. § 2000e–2(a)(2) (1981), and which protects persons from illegal employment practices that have a "disparate impact on the basis of race." 42 U.S.C. § 2000e–2(k) (Supp.1993). "[I]n enacting Title VII ... Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity ...," *Franks v. Bow-*

*man Transp. Co.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976) (citing cases), and to provide remedies that "make persons whole." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Hence, courts are given wide discretion "to fashion such relief as the particular circumstances of a case may require." *Franks,* 424 U.S. at 764, 96 S.Ct. at 1264.

The contractors rely on *General Building Contractors Ass'n,* 458 U.S. at 375, 102 S.Ct. at 3142, arguing that because they have not been found liable for violation of Title VII or contempt, the court cannot impose significant burdens on them in formulating a remedy against the union. In that case, Pennsylvania and individual African–Americans brought an action under the Civil Rights Act of 1866, 42 U.S.C. § 1981, 28 U.S.C. § 1651(a), alleging racial discrimination in the operation of a union hiring hall and apprenticeship program. The Supreme Court held that the nonliable defendant contractors and associations could not be assessed a portion of the costs of a remedial decree, *inter alia,* based on the discriminatory conduct of the defendant union and joint apprenticeship training committee. *General Building Contractors Ass'n,* 458 U.S. at 375, 102 S.Ct. at 3142.

However, the Supreme Court's holding in *General Building Contractors Ass'n* does not proscribe this court from ruling that contractors and their associations can be subjected to the proposed hiring hall and work share program as nonliable defendants. *General Building Contractors Ass'n* was based on Section 1981, which requires "purposeful discrimination," 458 U.S. at 386–91, 102 S.Ct. at 3147–50, and disparate treatment based on race. The contractors and their associations were not found vicariously liable for discrimination by the union, and the Court held that it lacked the equitable authority to impose specific injunctive relief against the nonliable defendants. This case, however, involves a disparate impact theory, rather than a disparate treatment theory, giving the courts a wider net in which to catch responsible parties when formulating relief. *See International Bhd. of Teamsters,* 431 U.S. at 335 n.

15, 97 S.Ct. at 1854 n. 15 (describing the differences between the two theories).

In addition, in *General Building Contractors Ass'n*, the Court concluded that the extent of the relief sought against the contractors and their associations was impermissible because nonliable parties could only be subjected to relief that was "minor and ancillary." 458 U.S. at 375, 401, 102 S.Ct. at 3142, 3155. A court's remedial powers can only be exerted where there is "a violation of the law and [can] . . . extend no farther than required by the nature and the extent of that violation." *Id.* at 399, 102 S.Ct. at 3154 (quoting *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976)). The Court refused to impose costs for the enforcement of a remedial decree, job training requirements and specific minority hiring goals on the nonliable contractors because this went beyond what was permissible and was not considered "minor and ancillary." *Id.* at 375, 401, 102 S.Ct. at 3142, 3155. In this case, however, plaintiffs seek only the contractors' compliance with a hiring hall and work share system, which constitutes relief of a minor and ancillary nature.

Minor and ancillary relief cannot be and is not the same relief to which a guilty defendant is subject and can not "impose[ ] considerable burdens on the employers and associations." *Id.* at 399, 102 S.Ct. at 3155. Minor and ancillary relief against nonliable parties has included requiring the submission of quarterly reports providing employment statistics, *id.* at 404–405, 102 S.Ct. at 3157–58 (O'Connor, J., concurring), and the installation of retroactive seniority systems. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 399–400, 102 S.Ct. 1127, 1135–36, 71 L.Ed.2d 234 (1982) (nonliable union compelled to implement retroactive seniority system contrary to collective-bargaining agreement where employer violated Title VII); *International Bhd. of Teamsters*, 431 U.S. at 347, 356 n. 43, 97 S.Ct. at 1860–61, 1865 n. 43 (nonliable union compelled to join litigation as defendant and to implement retroactive seniority system where employer violated Title VII).

More specifically, courts have imposed remedies that directly affect the hiring discretion of nonliable contractors in order to create equal employment opportunities. For example, in *General Building Contractors Ass'n*, on remand from the Supreme Court the district court held that "an employer may only recall an employee laid off within the preceding thirty (30) calendar days, notwithstanding *any* provision in any collective bargaining agreement to the contrary." *Commonwealth of Pa. v. Local 542, Int'l Union of Operating Eng'rs*, 619 F.Supp. 1273, 1277 (E.D.Pa.1985); *see also General Bldg. Contractors Ass'n*, 458 U.S. at 400, 102 S.Ct. at 3155 ("it is entirely appropriate for the [d]istrict [c]ourt to fashion its injunctive remedy" which would adjust the collective bargaining agreement and "to have that remedy run against the [contractors] as well as the Union and the [Joint Apprenticeship and Training Committee]").

In a prior decision in this case, the Second Circuit held Local 28 and the Joint Apprenticeship Committee in contempt for violating the affirmative action program. *See Local 28*, 753 F.2d 1172. Despite the fact that the court did not impose any contempt liability on the Contractors' Associations, it required contractors to hire one apprentice for every four journeypersons they employed, *id.* at 1178, 1181, 1183, 1188, thereby diminishing the contractors' power to hire employees at will.

In *Local 580*, 669 F.Supp. at 622, this court barred apprentices from seeking employment outside of the union's referral hall, thus thwarting contractors' ability to select their employees. Concluding that "major reform of the employment system is needed," the court fashioned this remedy without a finding of liability on the part of the Contractors' Associations. *Id.; see also United States v. Local 638 Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Compressed Air, Ice Machine, Air Conditioning & Gen. Pipefitters*, 360 F.Supp. 979, 990 (S.D.N.Y.1973) (Bonsal, J.) (directing union and employer association to modify referral practices despite the fact they were not found guilty of purposefully discriminating against nonwhite steamfitters), *aff'd*, 501 F.2d 622 (2d Cir.1974); *see also Local 28*, 565 F.2d at 32 (finding only Local 28 and the

Joint Apprenticeship Committee guilty of employment discrimination, in violation of Title VII, and approving a referral and job rotation system which assigns apprentices to contractors and does not permit contractors to fire at will); *General Building Contractors Ass'n,* 458 U.S. at 400, 102 S.Ct. at 3155 (if court finds that the relief against union and joint apprenticeship committee is insufficient to ameliorate the discrimination, then court may ultimately include contractors in the scope of the remedial decree).

The proposed hiring hall and work share program does not impose upon the Contractors' Associations more than minor and ancillary relief,[14] although the contractors argue that the burden imposed upon them by the hiring hall and work share program is serious and will have destructive effects on their ability to compete in the market place. The thrust of the contractors' argument is that if they do not hire journeypersons they know, their ability to estimate and adhere to a production schedule will be fundamentally damaged. The contractors openly admit to their preference for hiring journeypersons with whom they are personally familiar. (Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, May 9, 1994, at 15, 18) ("[w]hen demand increases,

contractors will typically rehire skilled and reliable workers the company has used before" and consulting engineers and owners "frequently request employees by name").

Those journeypersons who the contractors know well and wish to hire, however, are disproportionately white, as Siskin's data has clearly shown. Therefore, if left to their own devices, the contractors will continue to hire more whites disproportionately than non-whites, denying the latter employment opportunities and contributing to the appalling hours disparity. Such unfettered discretion allows contractors to hire journeypersons based on family, friends, and union referrals rather than merit. The proposed hiring hall and work share program aim to limit a contractor's discretion only as far as is necessary to remedy past discrimination and carry out the court's orders.

The contractors insist that their ability to prepare bids is undermined if they cannot hire workers with whom they are familiar because sheet metal craftspersons, unlike other construction workers, are not fungible, and "individual levels of skill and productivity vary greatly among sheet metal workers." (Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, May 9,

**14.** The contractors have not been found guilty of discrimination or contempt of the court's order. They were brought into the litigation only so that full relief could be provided to the plaintiffs. *Local 28,* 532 F.2d at 824 n. 3. Therefore, it is not necessary to evaluate the extent to which individual contractors have denied non-white journeypersons equal employment opportunities in this case. A showing of guilt is not necessary in order to impose the hiring hall and work share program because such relief is minor and ancillary. The question of contractor guilt is not before us.

However, while the contractors have not been found guilty of contempt, their insistence upon continuing to hire journeypersons they know, who are disproportionately white, frustrates the court's orders and the goals of the affirmative action program. Paragraph 7 of the O & J enjoins the Contractors' Associations from engaging in any act "which has the purpose or the effect of discriminating [against nonwhites]." The dismal hours disparity between white and nonwhite Local 28 journeypersons who were hired by the contractors suggests that the contractors are not the innocent bystanders they purport to be. While the contractors claim that their behavior has not been implicated in the plaintiffs' contempt motion, journeypersons tell

repeated stories of discrimination on the part of the contractors. *See* Appendix C. It is worth noting that as Local 28's apprenticeship program went into effect to increase its non-white membership, "[t]here was a sharp increase in the ratio of journeymen to apprentices employed by [the] contractors," 753 F.2d at 1180, which led to the court's mandate that contractors hire one apprentice for every four journeypersons employed. *Id.* at 1187.

Furthermore, contractors' efforts at taking limited measures to increase work opportunities for Local 28's underemployed do not mask the gross hours disparity or impress the court. Signing on to a Target Agreement which enables the contractors to "pay rates that are 15% less than the current Local 28 scale and [to] obtain other concessions from the Local 28 rules" greatly benefits the contractors themselves and provides only an "economic incentive to give employment opportunities to underemployed Local 28 members." (Mem.Law in Opp. to Stipulation & Order Imposing Hiring Hall & Job Rotation, Aug. 31, 1994, at 13). It is a far cry from adherence to the proposed hiring hall and work share program.

1994, at 24.) They argue further that they will not be able to prepare accurate bids for jobs, compete with non-union shops and union shops outside the New York area, or meet production deadlines because journeypersons taken from the hiring hall may lack the requisite skills. Given that bids are based in part on a contractor's estimation of the productivity of his workers and that the ability to be competitive is based on an ability to adhere to a production schedule, the contractors demand complete hiring discretion. They contend that the hiring hall and work share program force employers to take the least skilled workers (those with the fewest hours of work and hence, the least experienced) over those they know.

However, the contractors' contentions are not only inaccurate but are based on a biased premise. The contractors assume that those journeypersons with whom they are not familiar, who are predominantly nonwhite, will not have the requisite skills or productivity to do the job. While individual journeypersons may have differing skill levels, all journeyperson members of the union are trained to perform as journeypersons, having graduated from Local 28's apprenticeship program. By objecting to employing journeypersons they do not know, the contractors imply that the apprenticeship program does not adequately prepare journeypersons to meet the employment demands of the sheet metal contractors. There is no evidence that this is true.

In order to become a journeyperson, Local 28 members must successfully complete a six-week, 240–hour Pre–Indenture course of study and a four-year extensive Apprentice Training Program, comprised of 160 hours of classroom instruction and four years of on-the-job training supervised by the Joint Apprentice Committee. Each apprentice's performance is assessed on an ongoing basis and tested on an annual basis before he can reach the next level of the program. The JAC makes recommendations to the contractors to insure that apprentices are getting sufficiently well-rounded training. In addition to the Apprentice Training Program, journeypersons are able to take classes via the Journeyperson Upgrade Training program in order to meet an employer's additional demands and become certified in a particular area. There is no evidence that Local 28 journeypersons as a group are unqualified to meet the needs of the sheetmetal contractors.

Nonwhite journeypersons are caught in a quagmire. Contractors do not know them and consequently refuse to hire them, but contractors will never become familiar with these workers because they continue to hire the journeypersons they know, who are disproportionately white. Moreover, it is impossible for contractors to hire only journeypersons who they know, because in the beginning of his career each journeyperson was an unknown who had to be given a chance to prove himself. Nonwhite journeypersons are entitled to the same employment opportunities as their white counterparts.

Furthermore, the hiring hall and work share program allow a contractor to retain full discretion in hiring 20% of his new employees as his core or basic workforce which is "absolutely essential to a contractor's ability to estimate bids." (Contractors' Mem. in Opp'n to Stip. & Order Imposing Hiring Hall & Job Rotation, May 9, 1994, at 23.) In addition, contractors who require journeypersons with specific skills may designate this, thus limiting the pool of journeypersons to only those in the hiring hall with the requisite skill.

Contrary to the contractors' contentions, there is no evidence that the hiring hall's numerical ranking would penalize a productive employee, drastically reducing his incentive to excel at a particular job because his performance would not affect his chances of being rehired. Accepting the union's position that job security is used as a reward for productivity, the possibility of being designated as a core worker or being fired could motivate a journeyperson to function efficiently. In fact, if a worker is fired for lack of productivity three consecutive times, he gets put at the bottom of the list in the hiring hall.

The hiring hall would not have a large impact on the contractors' workforces given that upon the implementation of the hiring hall, contractors may retain all of their cur-

rent employees; it is only when there are job openings that a contractor must turn to the hiring hall, and even then it can select 20% of new hires from outside the hall. Given that "new construction projects have declined fairly steadily" since approximately 1988, (Teicher Aff. ¶¶ 27–32; Spinelli Aff. ¶ 5), the hiring hall has even less impact on employer discretion. Moreover, contractors retain complete discretion to fire at will.

The contractors' contention that the sheet metal industry in New York City would come to a grinding halt if the proposed stipulation were to be implemented is further undermined by the fact that other sheet metal locals in a wide variety of cities have operated successful exclusive hiring halls for years. *See United States v. Sheet Metal Workers' Int'l Ass'n, Local 36,* 416 F.2d 123 (8th Cir. 1969) (sheet metal local in St. Louis operates an exclusive hiring hall); *Sheet Metal Workers Local Union No. 54 v. E.F. Etie Sheet Metal Co.,* 1 F.3d 1464, 1477 n. 17 (5th Cir.1993) (sheet metal local in Houston operates an exclusive hiring hall), *cert. denied,* —— U.S. ——, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994); *NLRB v. Local 80, Sheet Metal Workers' Int'l Ass'n,* 491 F.2d 1017 (6th Cir.1974) (sheet metal local in Detroit operates exclusive hiring hall); *Contractors' Ass'n of Eastern Pa. v. Secretary of Labor,* 442 F.2d 159 (3d Cir.) (sheet metal local in Philadelphia operates hiring hall), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *United States v. Local No. 86, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers,* 315 F.Supp. 1202 (W.D.Wash.1970) (sheet metal local in Seattle operates exclusive hiring hall), *aff'd,* 443 F.2d 544 (9th Cir.1971), *and cert. denied,* 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

As with the hiring hall, there is no evidence that the work share program would lead to the destruction of the sheet metal industry in New York City. The work share program will go into effect only when there are few new job openings. To be laid off, a journeyperson must have enjoyed an unusually long period of employment—a non-basic journeyperson must have worked over 1200 hours and a basic journeyperson must have worked over 1680 hours in a fifty-two week period in order to be eligible for a layoff. It is highly unlikely that 80% of a workforce working at full efficiency would be uprooted and replaced by a completely different set of journeypersons. From 1984 to 1991, the average contractor employed only 33% of its journeypersons for more than 1200 hours each year. (Siskin Supp.Decl., Ex. C, Table C2.)[15] Furthermore, 20% of a workforce may be designated as core, in which case journeypersons could remain employed for 1680 hours during the fifty-two week period.[16]

The contractors argue that workforce continuity is necessary for maximum efficiency because there is a learning curve to which journeypersons must adjust before they become highly productive. The contractors contend that a breakdown in the process creates delays and decreases productivity. In addition, the contractors assert that replacing 80% of a workforce through the work share program would create significant recordkeeping, overhead, training and administrative and personnel costs. As was previously mentioned, however, there is little likelihood that 80% of a workforce would be replaced at once. Furthermore, the contractors rely on data regarding the impact of involuntary worker turnover on cost and productivity, (Gasperow Aff.), which is not necessarily indicative of the impact a hiring hall and work share program, designed to equally distribute employment opportunities, would have on productivity and morale of sheet metal workers. Finally, the court does not deny that there will be some costs to everyone in the administration of the hiring hall and work share program. However, these

---

**15.** Given greater unemployment, it is even less likely that a significant number of journeypersons would work over 1200 hours in a fifty-two week period. For example, in 1991, when unemployment was greatest for journeypersons since 1984, only 28% of journeypersons worked over 1200 hours. (Siskin Supp.Dec., Ex. C., Table C4).

**16.** It is also worth noting that the decision to designate 20% as the core was reached as a compromise between the negotiating parties, including contractors.

costs are outweighed by the importance of protecting nonwhite journeypersons from impermissible employment discrimination in violation of Title VII. The sheet metal industry is not entitled to thrive at the expense of nonwhite journeypersons and as a result of their oppression.

Given that contractors who show that the work share system will cause them hardship will be exempted from the work share program, *see* discussion *supra* p. 674, and that unemployment and the hours disparity will be evaluated on an annual basis by a statistical expert to determine whether the work share program must continue in operation, the program will not have an unduly burdensome effect on the sheet metal industry or on individual contractors.

In conclusion, contractors who have not been found guilty of contempt can be held to the requirements of the work share and hiring hall system, which constitutes no more than minor and ancillary relief. Unlike in *General Building Contractors Ass'n*, plaintiffs are not seeking monetary payment from the contractors so that the O & J and the AAAPO can be carried out or requiring job training and adherence to minority hiring goals. Plaintiffs seek only to have contractors comply with a job referral and rotation system designed to provide equal employment opportunity. There is no proof that the relief imposed upon the contractors will render them unable to compete in the marketplace or will destroy the sheet metal industry in New York City as a whole. The relief being imposed upon the contractors is nothing like the relief being imposed upon the union, but is indirect and insubstantial. Finally, the proposed remedy is required and appropriate given the extent of the violations against the journeypersons.

### 3. The Unfair Labor Practices Claim

■ The Contractors' Associations claim that by signing the stipulation the union has committed an unfair labor practice under 29 U.S.C. § 158(b)(3). The National Labor Relations Board has exclusive primary jurisdiction over any activity "arguably subject" to sections seven or eight of the National Labor Relations Act, 29 U.S.C. §§ 157, 158. *San*

*Diego Building Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959). Therefore, the court does not have jurisdiction to address this claim.

### 4. Breach of the Collective Bargaining Agreement

■ The Contractors' Associations argue that the union's act of signing the proposed stipulation constitutes a breach of the collective bargaining agreement. However, it does not point to any provision of the CBA that the union has violated merely by signing the stipulation, and it has not cited any cases supporting its claim that signing a stipulation requiring the union to breach a CBA is in itself a breach.

The reliance of the Contractors' Associations on *W.R. Grace & Co. v. Local Union 759,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), in which an employer entered into a conciliation agreement with the EEOC that required him to violate seniority provisions of a CBA he had signed with a union, is misplaced. The Supreme Court found that it *was* within the employer's power to enter into a conciliation agreement which required him to breach his collective bargaining agreement but that the CBA required him to bear the costs caused by the breach. *W.R. Grace & Co.,* 461 U.S. at 767, 103 S.Ct. at 2184.

### 5. Power to Modify the Collective Bargaining Agreement

The Contractors' Associations argue that the court lacks authority to modify the collective bargaining agreement. The Supreme Court has held that in the course of fashioning remedies for discrimination federal courts have the power to modify a collective bargaining agreement even where only one party to the agreement is guilty of discrimination. *See General Bldg. Contractors Ass'n,* 458 U.S. at 375, 102 S.Ct. at 3142. In a case resembling this one, the CBA arranged for a hiring hall system but allowed the employers to rehire ("recall") workers within ninety days without going through a hiring hall. *See Local 542,* 619 F.Supp. 1273. The district court found that the recall provision stood in the way of the union's attempts,

pursuant to an earlier court order, to increase the number of hours that minorities worked, and it ordered the employers not to recall workers after thirty days had elapsed. *Id.* at 1277. The employers were not considered liable for the discrimination that the order was intended to remedy, but the court found that altering the CBA was well within its powers, and this finding was upheld by the Third Circuit. *See Commonwealth of Pa. v. Local Union 542, Int'l Union of Operating Eng'rs,* 807 F.2d 330 (3rd Cir.1986).

### 6. The Court Has the Power to Amend the AAAPO

■ The Contractors' Associations argue that the court lacks the power to amend the AAAPO. The plaintiffs' motion to amend the AAAPO must be considered in light of the fact that this is a long-term institutional reform case. Institutional reform cases are unique in the extent to which courts must retain jurisdiction over details of the case for years and even decades. In such cases, courts need the power to modify their decrees as circumstances change and also in order to apply the lessons of experience to the litigation, *Kozlowski v. Coughlin,* 871 F.2d 241, 247 (2d Cir.1989), and the need for this power is not limited to cases in which the institution to be reformed is a governmental entity. *Patterson,* 13 F.3d at 38.

Recognizing that this was an institutional reform case requiring ongoing supervision of the union and possibly modification over time, Judge Werker stated, "At any time, any of the parties herein may apply to the Administrator and then to the Court for the purpose of seeking additional orders to insure the full and effective implementation of the terms and intent of this Program." *Local 638,* 421 F.Supp. at 617. In the O & J the court "retain[ed] jurisdiction over this action to ensure compliance with the terms of this Order and the program and to enter such additional orders [as] may be necessary to effectuate equal employment opportunity for non-whites and other appropriate relief." O & J ¶ 28. In particular, the court retains the power

> to require Local 28 and/or JAC to modify, amend or change their work referral and

employment activities, or institute or undertake additional procedures or activities regarding work referral or employment in order to (i) assist non-white journeymen and apprentices of Local 28 in obtaining employment or (ii) protect non-white journeymen and apprentices of Local 28 from bearing a disproportionate burden of unemployment.

O & J ¶ 21(g). The Second Circuit has affirmed the court's continuing jurisdiction to modify its orders in this case to meet Judge Werker's goal. *Local 28,* 753 F.2d at 1185.

The relief sought by the plaintiffs here falls within the scope of modifications anticipated and permitted by the O & J, because plaintiffs seek to enforce the AAAPO in the face of continued noncompliance by the union. Consequently, the court may order the modifications requested without determining whether there has been a significant change in law or fact as otherwise required by the Supreme Court in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

### C. Reinitiation Policy Stipulation

The modified reinitiation policy that Local 28 and the plaintiffs have outlined in their proposed stipulation and order claims to "facilitate and encourage the return to good standing" those members who are delinquent in their payments. (Appendix B, Reinitiation Stipulation.) Its provisions, however, in conjunction with the Constitution and Ritual, punish these individuals and unfairly deprive them of benefits to which they are entitled and which they would have received but for the union's violation of the O & J and AAAPO. For example, Article 16, Section 11(a) of the Constitution and Ritual states that "reinstatement shall not restore to such member any right to funeral benefits or any of the membership rights established prior to suspension." Thus, even if a member has been suspended for failure to pay his dues as a result of unequal employment opportunities, he cannot rejoin the union without losing hard-earned benefits and membership rights. Through no fault of his own, he must start from scratch.

Similarly, the hiring hall stipulation requires journeypersons who are reinitiated during the course of a year to be placed on the bottom of the hiring hall list as if they were fully employed prior to their reinitiation. It is unfair to treat nonwhite journeypersons who were suspended and ultimately terminated because they were underemployed as if they were fully employed—on the contrary, they should be afforded an opportunity to work.

In addition, Rule 4 of the proposed reinitiation policy requires that members suspended or terminated for non-payment of dues must not only pay back the dues for every month they were in arrears but must also pay a $10.00 fee for each of these months. Members harmed by impermissible discriminatory hiring practices and by subsequent exclusion from the union for inability to pay dues are then fined for every month that they were excluded, thus adding insult to injury. Furthermore, it is unfair to compel such members to pay dues for each month they were in arrears, given the fact that they were suspended as a result of the union's discrimination.

Given that the members who have been discriminated against are not guilty of any wrongdoing, they should not be assessed any penalty fees or exorbitant cumulative dues; nor should they lose their benefits and membership rights.[17] Instead, they should be made whole. Therefore, the parties' stipulation and order is rejected, and the parties will be required to submit to the Administrator for court approval a new reinitiation policy that does not penalize members suspended for nonpayment of dues when the failure to pay was a result of underemployment.

The plaintiffs request that the court fine the union $100,000 for adopting the reinitiation policy and applying it in a discriminatory fashion, and they suggest that the fine be used to subsidize the payment of back dues for nonwhite former members seeking reini-

tiation into the union. The court declines to adopt this remedy.

 Nor is the fine appropriate for remedial purposes. Remedial relief must compensate the injured party for actual loss. Where the injured parties and the scope of damage caused by the contempt are unascertainable, the court may order the contemnor to pay a sum of money into a fund which will be used to remedy the contempt. For example, the court created the ETER Fund to compensate for the failure of the union and the JAC to recruit and employ nonwhites as apprentices. *Local 28*, 1982 WL 445, at *4. Where the extent of the injury is clear, however, the court should award only the relief necessary to compensate proven injuries. Ordering the union to waive the membership dues and reinitiation fees of members suspended as a result of the union's policies will fulfill this purpose.

Additionally, the union shall pay the cost of notifying all nonwhite journeypersons terminated under the old readmission policy that they may reapply for membership under the new policy.

### D. Readjustment of the Membership Goal

It is evident that the membership goal must be readjusted in light of the demerger of Locals 28 and 10 and also in light of the 1990 census, which indicates that a change has occurred in the racial composition of Local 28's jurisdictional area, and the parties should immediately commence negotiations to present the court with a proposal for a new goal.

The plaintiffs request that in addition to the current requirement that the union attain the same percentage of nonwhite members as there are nonwhites in the relevant population, the union be required to attain the same percentage of nonwhite *journeyperson* members as there are nonwhites in the relevant population. They assert that this is

---

**17.** An additional flaw in the proposed reinitiation policy is that it permits those suspended for non-payment of dues and *"all* former members" (emphasis added), for whatever reason, who desire readmission/transfer into Local 28, to apply for readmission. (Appendix B, Reinitiation Stipulation, Rule 5.) The policy should not cover the

reinstatement of members suspended for cause or of those who have been expelled. Therefore, it should specify that only those former members who were terminated for non-payment of dues are eligible for readmission or transfer into Local 28 pursuant to this policy.

necessary because the rise in the percentage of nonwhite union members since 1984 has been fueled by a steep increase in the percentage of nonwhite apprentices while the percentage of nonwhite journeypersons has risen much more slowly and has remained unacceptably low. For example, as of March 1991 overall nonwhite membership was 21.40%, apprentices were 66.30% nonwhite, and journeypersons were only 16.44% nonwhite. If this trend continues, the union will reach the 29.23% membership goal while journeypersons are still disproportionately white. The plaintiffs claim that the percentage of nonwhite journeypersons remains low because nonwhite journeypersons leave the union when they cannot find work, and they claim that the union has contributed to the problem by failing to ensure equal employment opportunities and by enacting a restrictive reinitiation policy.

The court agrees that it is impermissible for the union to stack the apprenticeship program with nonwhites in order to boost its overall nonwhite membership percentage while encouraging a high nonwhite attrition rate among journeypersons. Consequently, the union is required to achieve the same percentage of nonwhite journeypersons as there are nonwhites in the relevant labor pool, as well as to achieve an overall nonwhite membership equal to the percentage of nonwhites in the relevant labor pool. Since journeypersons come almost entirely from the apprenticeship program, and apprentices are taken from the population as a whole, the journeyperson membership goal can be the same as the goal set for the union membership as a whole.

### E. Field Monitor

The union's long history of keeping inaccurate records has made it difficult for the Administrator and the plaintiffs to monitor the union's compliance with the AAAPO. These contempt proceedings were delayed while the plaintiffs attempted to reconstruct the union's data; in the meantime, the union continued to violate the plaintiffs' rights. On occasion, the poor recordkeeping served to mask the extent of the union's contempt, for example where the union overreported its nonwhite membership and underreported its white membership. The union's poor recordkeeping threatens to have even more serious consequences in the future, because the hiring hall and work share program will not succeed unless the contractors, the union, and the hiring hall/work share program operator keep accurate records of the hours worked by each union member at each work site.

Therefore, as part of the court's inherent contempt powers, and in response to the union's contemptuous actions in failing to ensure equal employment opportunities for its nonwhite members and in failing to comply with the AAAPO's recordkeeping requirements, the court orders the union to pay for a field monitor to be chosen by and work under the supervision of the Administrator. The field monitor will monitor the compliance of the union and the contractors with the recordkeeping requirements of the AAAPO, the O & J, and any additional recordkeeping requirements established by this order or by the Administrator pursuant to this order.

### IV. Order

The Administrator shall hold hearings to grant back pay to all nonwhite journeypersons who at any time during the period 1984 to the present were underemployed, were available for and actively seeking sheet metal work in Local 28's jurisdiction, and did not fail to mitigate damages. Journeypersons shall be considered underemployed if their hours worked are two or more standard deviations less than their expected hours worked.[18] Expected hours shall mean the number of hours that nonwhite journeypersons would have had to work during a particular period in order for their percentage of the total hours worked during that period to equal their percentage of membership in the union.

---

18. The Administrator shall determine what period of time should be used in calculating underemployment in order to minimize the risk of reimbursing journeypersons for what are actually random fluctuations in their hours. In other words, should a nonwhite journeyperson have to be underemployed for a week, for a month, or for longer to be awarded back pay?

In order to give the ETER Fund fine more coercive power, the Administrator is instructed to submit to the court a proposal for raising the ETER Fund contribution to a level that will cost the union enough money to provide an incentive to meet the membership goal and that will fully fund the activities that this court intended the Fund to perform, especially those activities intended to keep nonwhite journeypersons in the union. Additionally, the Administrator is instructed to submit to the court a schedule of interim goals accompanied by reporting requirements to determine whether the union has met the interim goals. If the union fails to meet the interim goals or to provide an adequate explanation for its failure to meet the goals, the Administrator will be empowered to increase the fines to be paid into the ETER Fund still further.

Additionally, the ETER Fund Order of August 31, 1983 is amended to allow nonwhite journeypersons access to Members Assistance Program counselors.

Plaintiffs shall submit within thirty days an affidavit of costs, attorneys' fees and experts' fees that they have expended in this action, accompanied by contemporaneous attorney time records, experts' billing statements, and other appropriate documentation, within four weeks of this opinion.

The union is ordered to institute, within three months of entry of this opinion, unless they are able to show good cause for an extension of time, a hiring hall meeting the conditions set out in the proposed hiring hall and work share stipulation as modified by this opinion. Specifically, journeypersons should be ranked in the hiring hall according to the hours they have worked to date in the current twelve-month period as well as in the previous twelve-month period. Nonwhite journeypersons whom the Administrator determines were suspended or terminated from the union for failure to pay dues as a result of underemployment [19] shall be placed on the hiring hall list upon their reinitiation into the union according to the hours they worked in the twelve months prior to their suspension. Journeypersons should not be required to be available for job referrals between the hours of 3:00 p.m. and 5:00 p.m. In lieu of the 3:00–5:00 requirement, the Administrator shall design a mechanism by which the hiring hall operator can notify journeypersons about work opportunities.

If after the hiring hall has been in operation for twelve months over 10% of the union's members enrolled in the hiring hall are unemployed and the number of hours worked by minority journeypersons during the year is less than the expected number given the percent of minority journeypersons in the union, then the work share system will take effect as specified in the proposed hiring hall and work share stipulation as modified by this opinion. Specifically, contractors will have the right to apply to the Administrator for hardship exemptions if they need to maintain a basic workforce that is greater than 20% of their total workforce excluding owner-members or if they need any member of their basic workforce for more than 1680 hours or any member of their non-basic workforce for more than 1200 hours. The Administrator may grant hardship exemptions for other reasons at his discretion. Contractors shall not be exempted from the work share system on the grounds that their workforce is racially balanced, small, or on any basis other than hardship. Contractors and the union shall not be liable for automatic liquidated damages for violation of this order, but the plaintiffs shall be entitled to move for contempt against anyone who frustrates the operation of the hiring hall and work share program. Nothing in this order shall be construed to diminish or limit the Administrator's powers to hear complaints from parties and to take all actions, as he deems necessary and proper, to implement and insure the performance of the provisions of this Order, the AAAPO, and the O & J.

---

**19.** Journeypersons shall be considered underemployed if their hours worked are two or more standard deviations less than their expected hours worked. Expected hours shall mean the number of hours that nonwhite journeypersons would have had to work during a particular period in order for their percentage of the total hours worked during that period to equal their percentage of membership in the union.

The Administrator shall determine for how long a journeyperson must have been underemployed prior to his suspension for his failure to pay dues to be attributed to underemployment.

In order to insure that members for whom there was a clear hours disparity preceding their default in payment of dues will no longer be penalized for the union's discrimination, the court orders the parties to meet with the Administrator to formulate a new reinitiation policy, for approval by the court, which shall meet the following requirements:

a) The policy must seek to facilitate and encourage the return to good standing of members who have been suspended or terminated for non-payment of dues.

b) The policy must state that individuals seeking readmission into Local 28 are required to submit a written official application form to the Financial Secretary Treasurer of Local 28, and it must specify where such application may be obtained.

c) The policy must exempt from the provisions of Article 16, Section 11(a) of the Constitution and Ritual any nonwhite suspended or terminated member whom the court Administrator determines was suspended for failure to pay dues as a result of underemployment [20] prior to his suspension. In particular, for these members Local 28 shall waive all reinstatement fees (including the local reinstatement fee, the International reinstatement fee and the International per capita tax) and his dues beginning with the month of reinstatement and going back to the date of suspension. The union shall also restore to these members all membership rights that they possessed prior to suspension, including the right to funeral benefits.

d) The policy must permit former members who were suspended or terminated from membership as a result of nonpayment of dues to apply for readmission at any time, regardless of the date of their suspension.

In addition, the union must pay for the costs of notifying all suspended and terminated nonwhite former members of the court's order and the final approved reinitiation policy.

The parties are ordered to immediately meet with the Administrator in order to recalculate the membership goal in light of both the demerger of Locals 28 and 10 and the 1990 census. Within two months of the date of this order they should present the court with a proposal for a new goal, consisting of a percentage of the union membership that should be nonwhite and a date by which the union should achieve this percentage. This goal shall apply to the group of journeypersons as well as to the union membership as a whole.

The court orders the union to pay for a field monitor, who will be chosen by and work under the supervision of the Administrator to check the accuracy of the reports filed by the union pursuant to the AAAPO and the requirements of the hiring hall and work share program. The monitor may visit work sites to ensure that the people who the union and the contractors report as working there are actually doing so, or he may use whatever methods the Administrator deems to be necessary.

IT IS SO ORDERED.

*APPENDIX A: PROPOSED STIPULA-TION AND ORDER REGARDING HIRING PRACTICES*

United States District Court

Southern District of New York

Equal Employment Opportunity Commission, and the City of New York, Plaintiffs,

-against-

Local 638 ... Local 28 of the Sheet Metal Workers' International Association, et al., Defendants.

71 Civ. 2877 (RLC)

*STIPULATION AND ORDER*

WHEREAS in July 1993 plaintiffs filed and served on defendants a motion for con-

---

**20.** Journeypersons shall be considered underemployed if their hours worked are two or more standard deviations less than their expected hours worked. Expected hours shall mean the number of hours that non-white journeypersons would have had to work during a particular period in order for their percentage of the total hours worked during that period to equal their percentage of membership in the union.

The Administrator shall determine for how long a journeyperson must have been underemployed prior to his suspension for his failure to pay dues to be attributed to underemployment.

tempt and for modification of the Amended Affirmative Action Program and Order ("AAAPO"), and;

WHEREAS plaintiffs have consented to defendant Local 28 of the Sheet Metal Workers' International Association's several requests to extend the time in which to respond to that motion so that the parties could negotiate a stipulation with respect to certain relief sought by plaintiffs;

WHEREAS the parties wish to narrow the issues to be resolved through further litigation:

IT IS HEREBY STIPULATED AND AGREED by the undersigned parties, subject to the Court's approval, that:

1. The Stipulation and Agreement Regarding Hiring Practices, attached as Exhibit A, be incorporated as a new section of AAAPO and that, upon entry of this Stipulation and Agreement as an Order of the Court, plaintiffs' request for a hiring hall/job rotation system as a remedy for contempt, *see* Memorandum of Law in Support of Plaintiffs' Motion for Contempt or for Modification of the Amended Affirmative Action Program and Order ("Pltffs' Mem.") at pp. 44–47, is withdrawn;

2. Neither this Stipulation and Order nor any provision contained herein shall be construed or used and/or admitted into evidence in any proceeding, hearing or trial as an admission that Local 28 has violated the Order and Judgment, the AAAPO or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000–e *et seq*, as amended, or any other statutes and/or ordinance;

3. Neither this Stipulation and Order nor any provision contained herein shall be construed as a withdrawal or abandonment of plaintiffs' motion for contempt which has been filed with the Court and served on the defendants, nor shall this Stipulation and Order be construed as a withdrawal or abandonment of plaintiffs' request for (a) backpay, *see* Pltffs' Mem. at pp. 47–48; (b) establishment of a separate non-white membership goal for journeypersons and interim goals and progress reports to measure Local 28's progress toward achieving its non-white membership goal, *see* Pltffs' Mem. at pp. 48–49; (c) invalidation of Local 28's reinitiation policy and contempt fines, *see* Pltffs' Mem. at pp. 50–51; (d) implementation of a new computerized recordkeeping system, *see* Pltffs' Mem. at pp. 51–52; and (e) attorneys' fees and expert fees, *see* Pltffs' Mem. at pp. 52–53;

4. Local 28 shall file its opposition to plaintiffs' motion for contempt on or before March 30, 1994. Plaintiffs' reply, if any, shall be due on or before April 25, 1994. Local 28 may seek an additional extension of time in which to serve its opposition to plaintiffs' motion for contempt; plaintiffs reserve their right to oppose such request.

Dated: New York, New York

March 23, 1994

PAUL A. CROTTY

Corporation Counsel of the City of New York

Attorney for Plaintiff the City of New York

100 Church Street, Room 329A

New York, New York 10007

(212) 788–1007

By: Neil M. Corwin
 Neil M. Corwin NC–6306
 Assistant Corporation Counsel

G. OLIVER KOPPELL

Attorney General of the State of New York

Attorney for Plaintiff New York State Division of Human Rights

120 Broadway, 23rd Floor

New York, New York 10271

(212) 416–8240

By: Sanford M. Cohen
 Sanford M. Cohen SC6601
 Assistant Attorney General

EDMUND P. D'ELIA

Attorney for Defendant Local 28 of the Sheet Metal Workers'

International Association

20 Exchange Place

New York, New York 10005

(212) 269–3233

Edmund P. D'Elia

Edmund P. D'Elia (EPD–7589)

SO ORDERED.

### STIPULATION AND AGREEMENT REGARDING HIRING PRACTICES

#### I. HIRING HALL

A. All contractors will be required to hire at least 80% of journeypersons hired during each twelve-month period from the hiring hall. The twelve-month period will start on the date that the hiring hall goes into effect. The hiring hall will be established within three months from the date that this stipulation is approved by the Court, unless defendants show good cause why the hiring hall cannot be established by that date.

B. Journeypersons will be placed on the hiring hall's unemployment list ranked in order by number of hours worked so that the journeyperson with the least number of hours worked during the previous one-year period will be ranked first. When journeypersons have identical hours worked during the previous one-year period, their rank on the hiring hall list will be determined by hours worked in the previous two-year period. Individuals who become eligible for hiring as journeypersons (e.g., through transfer, graduation from apprenticeship, reinitiation) during the course of the one-year period will be treated as if they were fully employed prior to becoming eligible for hiring. The person who is first on the list will be the first person referred from the hiring hall.

C. All journeypersons will complete an information form containing their name, social security number, telephone number, and any self-designation of a special skill they may possess. Special skills will include drafting, roofing, testing and balancing, metal pan ceiling work, welding, cutter, CAD/CAM operator, energy management (indoor air quality), architectural metal and enclosures. The information will be put into the computer data bank and each journeyperson assigned a personal identification number (PIN).

D. An unemployed journeyperson will call a special telephone number to report that he or she is unemployed. This information will be recorded electronically, and a computer, after checking a record of that journeyperson's hours, will place him or her in the appropriate spot on the hiring hall list. The hours in the data bank will be obtained from the Appendix H reports (as modified by the new computer system). A journeyperson's name will be removed from the list when he or she becomes employed.

E. Employers using the hiring hall will call a designated telephone number and inform the hiring hall operator of how many journeypersons are needed, the location of the job(s), the estimated duration of the job(s), and whether special skills are needed. The hiring hall operator will keep a detailed record of the content of each such request.

F. The hiring hall operator will be a person with knowledge of the industry chosen by Administrator Raff from among candidates proposed by plaintiffs and defendants. The operator will work in Administrator Raff's office and be under his supervision. The operator's position will be funded by the union.

G. Unemployed journeypersons will be required to be available to be contacted between the hours of 3:00 p.m. and 5:00 p.m. each day for assignment.

H. When a job becomes available, the hiring hall operator will contact journeypersons in the order in which they appear on the list. The hiring hall operator will keep a record of the response received from each journeyperson (e.g. accepted job, no answer, refused job and reason for refusal) and will mail a copy of this record to the journeyperson involved.

I. Members may decline a referral for any reason.

J. When a special skill is requested, the highest ranking person on the list who has designated that skill will be referred out for employment.

K. If a contractor terminates a journeyperson sent from the hiring hall for reasons other than lack of work, he or she must provide a written explanation to the hiring hall of the reason for that journeyperson's termination. The journeyperson must be sent a copy of that explanation. In a procedure to be established, the journeyperson must be given an opportunity to demonstrate that he or she was not terminated for failure to do the work assigned. If it is determined that the termination was not based on the journeyperson's failure to do the work assigned, then the termination does not affect the journeyperson's status on the hiring hall list as described below in subparagraph L. However, such a determination does not entitle the journeyperson to reinstatement. In addition, by availing himself or herself of this procedure, the journeyperson in no way prejudices his or her rights to take action on a claim that the termination was based on unlawful discrimination.

L. If any journeyperson referred out for employment is laid off by three consecutive employers for failure to do the work assigned, that journeyperson will be placed at the bottom of the list, except that journeypersons laid off because they had self-designated a special skill and were found unqualified to perform that skill will be reclassified and ranked according to hours worked.

## II. TRAINING

A. Journeypersons laid off by three consecutive contractors due to failure to do the work assigned will be encouraged to take refresher classes funded by the union to improve their skills. Upon successful completion of these classes, such journeypersons will be returned to ranking on the hiring hall list according to hours worked.

B. Courses in all specialty areas in which employees can self-designate (except for metal pan ceiling work) will be funded by the union and available to all members free of cost. An initial fee in an amount to be determined, subject to plaintiff's approval, may be charged for these courses, but such a fee shall be refundable upon the completion of the course.

## III. JOB ROTATION

A. A job rotation system will be triggered at the earliest on January 1, 1995 or as soon thereafter as is practicable if: (a) the number of regular or overtime hours worked by minority journeypersons from January 1, 1994 through December 31, 1994 is more than one standard deviation less than the expected number of hours worked by minority journeypersons given the percentage of minority journeypersons in the union; and (b) the number of journeypersons on the union's hiring hall unemployment list during the same time period has averaged 10% or more of the union's journeyperson membership, excluding retirees and suspended or terminated members.

B. When the job rotation system is in effect, each employer may designate a maximum of 20% of his or her mechanics (excluding owner-members) as a basic workforce.

C. Journeypersons not designated as part of an employer's basic workforce must be laid off after working for 1200 hours during a 52-week period. If the job rotation system goes into effect on January 1, 1995, the first such 52-week period will run from July 1, 1994 through July 1, 1995. After being laid off, these journeypersons will be placed on the hiring hall list in order of hours worked. They may not be hired outside of the hiring hall system except by contractors exempt from job-rotation under paragraph H below until the 52-week period has expired.

D. Journeypersons who are designated as part of an employer's basic workforce must be laid off after working for 1680 hours during a 52-week period. If the job rotation system goes into effect on January 1, 1995, the first such 52-week period will run from July 1, 1994 through July 1, 1995. After being laid off, these journeypersons will be placed on the hiring hall list in order of hours worked. They may not be hired outside of the hiring hall system except by contractors exempt from job-rotation under paragraph H below until the 52-week period has expired.

E. At the expiration of the 52–week period, each employer may use its 20% hiring outside of the hiring hall to rehire journeypersons whom it had laid off pursuant to section III, paragraphs C and D, except that his or her overall hiring during the next twelve months will still have to include 80% hiring from the hiring hall. If job rotation is still in effect, the requirement for layoffs of journeypersons pursuant to section III, paragraphs C and D will remain in place.

F. After every 52 week period, a statistical expert selected by plaintiffs and funded by the union will evaluate the hours and unemployment rates of minority and white journeypersons to evaluate whether the job rotation system should be triggered. The first such period will run from January 1, 1994 through December 31, 1994.

G. A contractor will be exempt from the job rotation system if it demonstrates that it employs an average of three or fewer journeypersons, excluding owner-members, during the 52 week period prior to the determination that the job rotation system has been triggered.

H. A contractor will be exempt from the job rotation system if it demonstrates that both the percentage of regular hours worked by non-white journeypersons and the percentage of overtime hours worked by non-white journeypersons for that contractor are either equal to or greater than the percentage of non-white journeyperson members in the union during the 52 week period prior to the determination that the job rotation system has been triggered.

## IV. *MONITORING*

A. The union will develop and plaintiffs will approve software to evaluate the overall operations of the hiring hall and job rotation system, each contractor's compliance with hiring hall and job rotation system requirements and the system's effect on the hours disparity based on race.

B. Each contractor will be monitored on a monthly basis by the union to ascertain its compliance with hiring hall and job rotation requirements. The union will generate and furnish reports on each employer to plaintiffs on a monthly basis.

C. The union will fund on an ongoing basis a statistical expert selected by plaintiffs to conduct an evaluation of the overall system and its effect on the hours disparity based on race.

## V. *PENALTIES FOR NONCOMPLIANCE*

A. Any contractor out of compliance with the requirement to hire 80% of its journeyperson employees through the hiring hall or with any aspect of the job rotation system, if in effect, will be assessed liquidated damages based on a formula to be established.

B. The union or any contractor responsible for noncompliance with any other portion of this agreement will be assessed liquidated damages based on a formula to be established.

## VI. *REVISIONS TO SYSTEM*

A. Plaintiffs' statistical expert will prepare an annual report evaluating the hiring hall system, the job rotation system (if applicable) and their effect on the hours disparity based on race.

B. If the system in place has not corrected the disparity of hours based on race, both plaintiffs and defendants will have the opportunity to submit recommendations for changing the system based on plaintiffs' expert's annual report to Administrator Raff, who will make the determination as to which recommendations should be adopted.

C. Such changes may include, *inter alia*, having employers hire 100% of journeypersons from the hiring hall; decreasing the percentage of journeypersons in the core basic work force; decreasing the number of hours that journeypersons may work when the job rotation system is in effect; revising the triggering events for the job rotation system; and/or any other recommendations made by the parties based on plaintiffs' expert's annual report and approved by the Administrator.

D. In addition to the changes contemplated in paragraph C, the parties to this stipulation may make such other modifications as are deemed necessary either through mutual consent or, where there is not mutual consent, upon duly noticed motion to the Administrator.

### APPENDIX B: PROPOSED STIPULATION AND ORDER REGARDING READMISSION TO THE UNION

United States District Court

Southern District of New York

Equal Employment Opportunity Commission, and the City of New York, Plaintiffs,

-against-

Local 638 ... Local 28 of the Sheet Metal Workers' International Association, et al., Defendants.

71 Civ. 2877 (RLC)

### STIPULATION AND ORDER

WHEREAS in July 1993 plaintiffs filed and served on defendants a motion for contempt and for modification of the Amended Affirmative Action Program and Order ("AAAPO"),

WHEREAS plaintiffs' motion seeks, *inter alia*, invalidation of the reinitiation policy applied by Local 28 prior to the filing of the contempt motion;

WHEREAS Local 28 has adopted a new reinitiation policy and;

WHEREAS the parties wish to narrow the issues to be resolved through further litigation:

IT IS HEREBY STIPULATED AND AGREED by the undersigned parties, subject to the Court's approval, that:

1. Local 28 shall abide by the Reinitiation Policy, attached as Exhibit A; in the event that Local 28 seeks to modify any aspect of this Reinitiation Policy, including any changes to the amount charged as a reinitia-tion fee, Local 28 shall apply to the Court for such modification;

2. Within thirty (30) days of the entry of this Stipulation as an Order of the Court, Local 28 shall provide written notice of the Reinitiation Policy to all current members, to all suspended members, and to all individuals whose membership in Local 28 has been terminated since November 1, 1988;

3. Upon entry of this Stipulation as an Order of the Court, plaintiffs' request for the invalidation of Local 28's reinitiation policy, *see* Memorandum of Law in Support of Plaintiffs' Motion for Contempt or for Modification of the Amended Affirmative Action Program and Order ("Pltffs' Mem.") at p. 50, is withdrawn;

4. Neither this Stipulation and Order nor any provision contained herein shall be construed or used and/or admitted into evidence in any proceeding, hearing or trial as an admission that Local 28 has violated the Order and Judgment, the AAAPO or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000–e *et seq;*

5. Neither this Stipulation and Order nor any provision contained herein shall be construed as a withdrawal or abandonment of plaintiffs' motion for contempt which has been filed with the Court and served on the defendants, nor shall this Stipulation and Order be construed as a withdrawal or abandonment of plaintiffs' request for (a) backpay, *see* Pltffs' Mem. at pp. 47–48; (b) establishment of a separate non-white membership goal for journeypersons and interim goals and progress reports to measure Local 28's progress toward achieving its non-white membership goal, *see* Pltffs' Mem. at pp. 48–49; (c) contempt fines for Local 28's reinitiation policy prior to entry of this Stipulation and Order, *see* Pltffs' Mem. at pp. 50–51; (d) implementation of a new computerized recordkeeping system, *see* Pltffs' Mem. at pp. 51–52; and (e) attorneys' fees and expert fees, *see* Pltffs' Mem. at pp. 52–53.

Dated: New York, New York

October 27, 1994

readmission/transfer into Local Union No. 28.

PAUL A. CROTTY

Corporation Counsel of the City of New York

Attorney for Plaintiff the City of New York

100 Church Street, Room 329A

New York, New York 10007

(212) 788–1007

By: Neil M. Corwin

Neil M. Corwin NC–6306

Assistant Corporation Counsel

G. OLIVER KOPPELL ·

Attorney General of the State of New York

Attorney for Plaintiff New York

State Division of Human Rights

120 Broadway, 23rd Floor

New York, New York 10271

(212) 416–8240

By: Sanford M. Cohen

Sanford M. Cohen SC6601

Assistant Attorney General

EDMUND P. D'ELIA

Attorney for Defendant Local 28 of the Sheet Metal Workers'

International Association

20 Exchange Place

New York, New York 10005

(212) 269–3233

Edmund P. D'Elia

Edmund P. D'Elia

SO ORDERED.

## EXHIBIT A

*POLICY/REGULATIONS IN RELATION TO READMISSION INTO SHEET METAL WORKERS LOCAL UNION NO. 28*

### POLICY

It is the policy of Sheet Metal Workers Local Union No. 28 ("Local Union No. 28") to facilitate and encourage the return to good standing membership individuals who have been suspended for non-payment of dues as well as those former members who desire

### RULES

1. Individuals seeking readmission into Local Union No. 28 are required to submit a written official application form, in person, to the Financial Secretary Treasurer of Local Union No. 28, whose offices are located at 500 Greenwich Street, New York, New York 10013. Said application forms may be obtained at the aforementioned Local Union office.

2. All former members who tender less than full payment of all requisite fees and dues (i.e. reinstatement/reinitiation fees) with their official application form shall be enrolled as members of Local Union No. 28. The minimum payment due with said official application shall be one month's dues and payment of $25.00 toward the member's reinstatement/reinitiation balance.

3. The balance of such payments shall be made when applicants obtain employment with a Local Union No. 28 contractor. Such Applicants who obtain employment with a Local Union No. 28 contractor shall pay 10% of their net weekly wage within ten (10) business days of receiving such wages to Local Union No. 28 in payment of monies due and owing.

4. Members with outstanding reinstatement/reinitiation fee balances may not pay dues in advance of 1 month. Reinstatement/reinitiation fees shall be $10.00 per month for each month of unpaid dues in addition to the unpaid dues. In lieu of official dues receipts, members with outstanding reinstatement/reinitiation fees shall receive verification indicating their status as members with outstanding balances.

5. The Financial Secretary Treasurer shall unconditionally enroll, as good standing members, all former members who tender full payment of all requisite fees and dues with the official application form.

6. All former members who shall comply with the International constitution and Ritual shall be deemed members "in good standing."

694

 

7. Former members who were suspended from membership as a result of non-payment of dues or who seek transfer readmission pursuant to the aforementioned rules may apply at any time, regardless of the date of their suspension.

### APPENDIX C: JOURNEYPERSON AFFIDAVITS

Robert Taylor is an African–American graduate of the apprentice program of Local 28, and he became a mechanic in 1979. He worked first for General Sheet Metal, where he had spent his entire apprenticeship, but left after a time with the desire to learn new skills. Taylor then worked for several contractors, learning such skills as fabricating and installing radiator enclosures and rigging. He worked for Delta Sheet Metal in 1981 for a few weeks and was the only black mechanic at the site. One day Delta's superintendent visited—that same day he was laid off and observed the hiring of four white workers. In 1990 Taylor went back to Delta seeking employment. It was lunch time and no one responded to his inquiry about where the office was even though the foreman was among the men he had addressed about the location of the office. When Taylor asked about an opening, the foreman's response was negative. In late 1980 he worked for Global Sheet Metal and was moved constantly from job site to job site. When he confronted the owner he was told that he had to be moved around in order to meet minority hiring goals, and when he refused to move to another site he was fired. During periods of unemployment Taylor would call business agents to inform them of his status and his name would be put on a list—he asserts that white men out of work for less time than he was had been put on jobs before him. He says that business agent Fitzpatrick had helped him get work several times while running for reelection, but lately had not returned his phone calls. From 1990 to 1992 Taylor sent resumes, and called or visited a number of shops seeking work without success. In April 1992 he finally secured work with Industrial Metal Fabricators as a fore-man, but he was laid off in July 1992 and has not worked since.

African–American Bernard Wyatt became an apprentice as a result of this case and completed the apprenticeship program in 1978. He worked for Brooks Sheet Metal until 1984, when the company went out of business. Subsequently, he started working at Center Sheet Metal. Wyatt would begin working at one job site and then be moved to a new site where a new job was being started. He was never consulted about whether he wanted to move, although white men were. The constant shifts deprived him of the overtime which comes when jobs are close to completion, so he left Center in 1988. Wyatt then went to Heritage Sheet Metal where he worked for six months as the only black mechanic out of a group of ten to thirteen mechanics. He left because as at Center he was shifted from site to site and thus deprived of overtime opportunities. His next job in late 1988 or early 1989 was with General Sheet Metal, where he faced the familiar "shifting" pattern. Wyatt returned to Center in 1989, where he worked for almost a year but left when the company wanted to ship him up to Mt. Sinai, which was too far from his home and where men were being laid off. From 1989 to 1991 he worked for Allied/RPM until financial difficulties beset the company. Since then he has had difficulty finding work, although he worked at Heritage through the intervention of the Borough President from April 1991 through September 1991. He sought work at Triangle, where a large number of whites were being hired, and was told his name would be put on a list. One day he saw a book being used in which his name was not listed, and was told by the foreman that he had no chance of being hired unless he knew either the foreman or a business agent knew him. Once again, he was eventually hired through the intervention of the Borough President, and he worked at Triangle from October 1991 until April 1992. Since then Wyatt has found no work.

Pedro Espinal, a Latino, entered the apprentice training program in 1974 as one of sixty apprentices. For the first nine months

he received no work assignments and had to take a part-time job to support himself and keep current with his union dues. In the fall of 1975 he received his first assignment. After a month, he was rotated off that job. In the spring of 1976 he was hired by Alpine Sheet Metal, where he worked until December 1979. Espinal completed the apprentice program in January 1980, and shortly after graduation he was hired by Tri–County Erectors. This was typical of his opportunities—short-term and undesirable. It was undesirable because all work was performed outdoors in the bitter cold, and the site had a history of physical violence between the sheet metal and iron worker unions. The jobs that he has been on since leaving Tri–County have been the lowest-status jobs in the trade, and in one year he worked for 22 different contractors. Espinal has taken night classes in welding, testing and balancing, cutting and layout, residential heating, field installation and drafting, earning several certificates of achievement in these areas. Although he has been a member of the union for 18 years he cannot secure continuous, long-term employment, and has had no opportunities to perform overtime work.

Roy Robinson, an African–American, entered Local 28's apprenticeship program in 1989, and he spent his entire apprenticeship working for Triple "S" Sheet Metal, except for the time he spent in apprenticeship school. He was laid off at his graduation ceremony and has not worked since.

Nilsa Castaneira, a Latina, graduated from the apprenticeship program in August 1992 but has yet to work one full day as a full-scale mechanic. She contacts business agents at least every month, but she never receives any work or even any calls in return.

African–American Troy Smith enrolled in the apprenticeship program in 1988 and worked on various jobs. At Phoenix he asked the foreman for permission to work on the plasma cutter and was refused on the grounds that he lacked experience, but a white apprentice with no more experience than he was allowed to work on the cutter. He was laid off at Phoenix within two months of graduation, but the white apprentice who was working on the plasma cutter stayed on the job and continued on that job even after becoming a mechanic. Smith spent the last two months of his apprenticeship unemployed. Since graduation he has found no employment.

Mark Williams, an African–American, started apprenticeship training in 1989. He worked at Heritage and was laid off when a white apprentice was not. He worked for Wolkow Baker from 1991 until October 1992. Williams graduated in August 1992 and was kept on as a mechanic until being laid off in October. Since then he has been unable to find work despite diligent efforts.

African–American Nola Smith entered the program in February 1986, under a program at New York Technical College called "Expanding Options for Women," which she had entered under the Joint Training and Partnership Act. During her last term as an apprentice she worked for D.N.S. Sheet Metal but was laid off as soon as she became a mechanic in February 1990. Smith worked for Steel Towne Sheet Metal for a short time and then worked for Heritage from August 1990 until December 1991. She was told that she would be recalled in a few weeks but received no calls, although several white mechanics laid off with her were recalled. She was referred to a one-month job at C.W. Sheet Metal and later to a fan maintenance job at Heritage which paid only eighty percent of union scale. Since then Smith has had no work. Her dues are paid up to the end of August 1993, but she will not be able to pay thereafter unless she receives employment.

Mark Laramore, an African–American, entered the apprenticeship program in August 1986 and became a journeyperson in August 1990. He found work as an apprentice at various shops but was laid off as soon as he became a mechanic. Laramore worked for one month in 1990 at Efficient Towers as a mechanic but after that was laid off and could find no more work. He has been con-

tinuing to pay union dues but does not think that he will be able to pay past May 1993.

Steven Laramore, an African–American, had an interview with Casey and the Joint Board after graduation from vocational high school in 1983, but he never heard from the union. In 1985 Local 28, spurred by this case, recruited minority apprentices. His brother obtained some application forms which Laramore filled out, and he was accepted as an apprentice in 1986. Laramore spent two years at Builders Sheet Metal, now defunct. A white apprentice who was hired after him received more training opportunities than the black and Hispanic apprentices who had been there longer. He spent his last two years as an apprentice at Penguin Sheet Metal, where he and the other minority apprentices were kept in the shop, given little opportunity to work in the field, earn overtime, or gain new skills. Furthermore, Laramore was laid off while whites were given overtime, which is against union rules. He graduated in 1990, worked at Penguin as a mechanic until September 1991, and since then he has been unable to find work.

Jerome J. Hernandez, an African–American, joined the apprenticeship program in February 1986 and worked for J.J. Flannery until three months before graduation in February 1990. He searched for work with no success and received help from the union only reluctantly. Hernandez found a job with Contractors' Sheet Metal which lasted only a few weeks. He was then unemployed for several months, during which time he worked off and on for Larry Bonface, a former foreman at Flannery who had opened his own shop. He worked at United Sheet Metal from September 1992 until November 1992. Since then Hernandez has worked on only three brief jobs, and he has not worked more than three months with any contractor since becoming a journeyperson. Several times white men were hired after he was told there was no work. Once Hernandez learned that white men were being given overtime opportunities at a job from which he had just been laid off. He returned to the job site and caught a union business agent getting a white man hired for overtime. He was then hired but was let go after two weeks.

African–American Rick Washington graduated from the apprenticeship program in 1991. He has worked as a mechanic for only six days. During his apprenticeship, he was subjected to racial slurs and hostility, and the union provided no support. When Washington had a transportation problem and asked to be assigned to another field he was told that if he did not like the job he could quit. For about six weeks, Washington was on a picket line at a job site where they were not hiring union sheet metal workers. The business agent pulled him off the picket line because the agent said that a settlement was about to be reached. As it turned out, several mechanics were hired subsequently, but Washington was not one of them. Washington became completely frustrated with the limited training opportunities, given his desire to learn more sophisticated skills.

Kenneth O'Connor, and African–American, entered Local 28's four year apprenticeship program in February 1988 and worked for F.R.D. Sheet Metal for the duration of his apprenticeship. He and the other minority apprentice working for F.R.D. were repeatedly told that they would be laid off as soon as they completed the apprentice program. Jimmy Mack, the other minority apprentice, was in fact laid off the day before graduation. O'Connor worked at F.R.D. as a mechanic until April 28, 1992. Since then, O'Connor has had no employment. He visits sites, but the foremen often do not want to take his name. He doubts he will ever obtain full employment as a minority mechanic under the current system.

African–American Travers Everson graduated from Local 28's apprenticeship program in July 1987. While an apprentice at Penguin Sheet Metal Everson worked with a foreman who later moved to AABCO Sheet Metal. The foreman hired him as a mechanic at AABCO immediately after graduation. Other minority apprentices were not so fortunate and were fired as soon as they gradu-

ated from the program, despite their high skill level. In the meantime, Everson noticed that white apprentices were being kept on as mechanics, although they were less skilled than the minority apprentices who were let go. He noted a similar pattern at Penguin. While minority mechanics were hired at AABCO during busy periods, they were the first to be let go. Because the firm was busy, one black mechanic was hired at AABCO in December 1989, along with three or four white mechanics. The black mechanic was laid off several times between December 1989 and the following summer. The newly hired white mechanics worked continuously.

A wrist injury forced Everson to leave the job in February 1990. In August 1990, he started looking for work. Everson went to AABCO but was told that no work was available. He has been back several times and has received the same response, and he has never been called by AABCO. An apprentice working there told him that white mechanics had been hired subsequent to his visits. Everson visited three shops a week, seeking work between August 1990 and the summer of 1992. Has been unable to pay union dues and as a result his membership has been terminated. On a recent call to Casey, he was discouraged from seeking readmission. He was told that he would have to apply to the Union Executive Board which would probably deny his application because of unemployment.

African–American Eric Thomas enrolled in the Local 28 apprenticeship program in May 1980 and completed the program four years later in May 1984. For his entire four-year apprenticeship he worked at Steel Towne Sheet Metal. He saw few minority journeypersons. The four or five he did see working at the shop were employed for short periods of time. During his apprenticeship, he attended meetings of a group of minority journeypersons called Metal (now defunct), where many of the members spoke of the difficulties they encountered in finding work,

describing the same troubles Thomas would encounter when he became a journeyperson.

After becoming a mechanic in May 1984, Thomas continued to work at Steel Towne for about a year and then was laid off along with another black journeyperson, Herbert Young. Thomas then contacted a business agent who had been president of Local 55 on Long Island before it merged with Local 28. Thomas was told to report directly to the foreman of Quality Sheet Metal on Long Island and to tell the foreman that he had been referred by the business agent. Thomas was hired and worked there for about two and a half years. Despite the construction boom in the 1980s, he and his partner never received overtime work from Quality on a regular basis, even though such opportunities were given to whites. Thomas would quit Quality to work for other contractors in order to get overtime. Blacks were hired regularly for overtime when the Javits Convention Hall was being constructed, Thomas suspects because of the enforcement of the equal opportunity mandate by the government. Thomas and his partner, Vinnie Flowers, were hired by Liberty Sheet Metal to work on a renovation project near the World Trade Center. They were the first team hired, and shortly thereafter a white pair was hired. After two months on the job, he and Vinnie were told there was a slowdown. They were fired, but the two whites were kept on.

Since the late 1990's, Thomas has found it difficult to find work despite his constant efforts, including calling union business agents, visiting shops, attending union meetings and contacting personal acquaintances at various shops. Thomas lapsed in his union dues and was suspended. Danny Wilton told him that he could arrange to pay his back dues in installments. He is extremely discouraged.

Dennis Lyght, an African–American, became a journeyperson member of Local 28 in September 1988. His first job was with D.N.S. Metal Industries. He worked at Mt. Sinai Hospital from October 1988 to May 1989, when he was laid off because D.N.S.

went out of business. Heritage took over and Lyght was able to get work in 1989 because of his personal relations with Ricky, a white journeyperson, who had been his partner at D.N.S. With Ricky as his partner, Lyght was able to work regular hours and overtime. He was assigned to work at Queens College along with six white men. The union business agent for Queens designated him shop steward. One day Heritage was late delivering pay checks and all the men had already gone home, so they could not get paid before the holiday. As shop steward, Lyght notified the business agent of what had happened. The men were entitled to one hour extra pay. When Lyght showed up after the holiday, he was told that the man who handled the payroll for Heritage, Lenny Liebowitz, had said that if Lyght persuaded the men to return the extra pay, it would be a feather in Lyght's cap. Lyght related this conversation to the business agent, and as a result Liebowitz was brought up on formal charges and fined. Lyght believes that this incident soured his relations with Heritage. Since then he has had few jobs, and since May he has had no work at all.

Melbourne Pearson, an African-American, finished the Local 28 apprentice program in 1985. He worked at Bunker Sheet Metal for about two months after graduation. As with his apprentice tour of duty he was not given the opportunity to work overtime which was afforded the whites with whom he was partnered. After Bunker Sheet Metal, Pearson worked for General Sheet Metal for about a year. He was passed over again for overtime, and he only got overtime opportunities when a job had to be finished and the white mechanics were unavailable. For the next few years he was able to obtain work by calling shops to find out what work was available. Since 1988 Pearson has encountered difficulty in finding work. It has been chiefly through Local 28 business agents that Pearson was able to get work. The business agents would return his calls and tell him to report for work at a particular job site. Despite this assistance, Pearson is often out of work for months before another job becomes available. His visits to shops have been fruitless, even though he hears that these shops are hiring white mechanics. Indeed, he was advised that one shop had hired five or six white mechanics immediately after Pearson was told there was no work. On April 19, 1993, he spoke to the foreman at OMC Sheet metal and asked why he had not been called since his name was on the OMC list since 1989. The foreman said that he was required to hire from a union list and that his name was not on it. Pearson spoke to Casey about this and asked why his name was not on the Union list. Casey promised to look into it and a month later was still looking into it.